UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard CANALES, Defendant-Appellant.

No. 77–5149.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 18, 1977.

Decided March 17, 1978.

Rehearing and Rehearing En Banc
Denied May 19, 1978.

Clifford R. Williams, Detroit, Mich., for defendant-appellant.

Richard Canales, pro se.

James K. Robinson, U. S. Atty., F. S. VanTiem, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, Chief Judge and LIVELY, Circuit Judge and DUNCAN, District Judge.*

DUNCAN, District Judge.

Defendant-appellant Richard Canales was convicted by a jury of possession with intent to distribute 2,998.6 grams of heroin in violation of 21 U.S.C. § 841(a)(1). Prior to trial the appellant moved to suppress evidence seized after a warrantless search of his person and luggage by agents of the federal Drug Enforcement Administration (DEA) at the Detroit Metropolitan Airport. After an evidentiary hearing, the district court denied the motion to suppress. The district judge found that the DEA agents' initial stop of Canales was a valid investigative stop. See, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The district judge further found that, following the stop, Canales had given his voluntary consent to the search during which the heroin was seized. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). We affirm.

Government witnesses testified that in March, 1976, agents of the Michigan State Police were investigating Francis McMul-len, whom they believed to be involved in heroin trafficking in the Detroit, Michigan, area. In the course of this surveillance, the police observed, in the vicinity of McMullen's address, an automobile titled to Canales and his common law wife Roberta Langowski.

On one occasion, while an undercover officer was inside McMullen's home purchasing narcotics, Roberta Langowski entered the home. The State Police came to suspect that Canales was McMullen's supplier; believing Canales to be travelling to Texas and Mexico to obtain heroin, they asked the Drug Enforcement Agency in Detroit to investigate the case.

DEA agents in Detroit and Laredo, Texas, were told of Canales' suspected role in the heroin trafficking; he was described as being about 5'8" or 5'9", approximately 42 years old and a Mexican male from Dearborn or Dearborn Heights, Michigan.

On June 18, 1976, after the DEA had entered the case, Agent Mattioli of the Detroit office was informed by DEA agents in Laredo, Texas, that Canales was in Texas. The Texas agents followed Canales into Mexico where he entered the Shamrock Bar. From previous narcotics investigations and surveillances, the DEA agents knew of the Shamrock Bar. It was reputed to be the site of narcotics trafficking. After talking with someone and perhaps using the phone, Canales left the bar and headed towards a rural area outside of a village in Mexico. Thereafter, the agents lost track of him during a storm. The agents were further advised that the defendant was well known to people at a car rental agency and motel in the Laredo area.

Three days later, June 21, 1976, the Texas agents again telephoned Agent Mattioli in Detroit and informed him that Canales was on Braniff Flight 400 back to Detroit. Mattioli then called Agent Morelli at the Detroit airport and told him that Canales would soon be arriving at the airport and

* Hon. Robert M. Duncan, United States District Judge for the Southern District of Ohio, sitting by designation.

that he might be carrying heroin. Agent Morelli relayed this information to Agent Anderson. Contemporaneous with Agent Mattioli's call to the airport, a lieutenant with the Detroit Police Department telephoned DEA Agent Mihills at the airport, gave him the background of the case and substantially the same information as given to Agent Morelli.

Agent Mihills then teamed with Agent Anderson. The two agents proceeded to the arrival gate and spotted a man disembarking from the Braniff flight who fit the description of Canales and was in fact Canales. Canales met Langowski and her child, exited the terminal, and walked towards the parking lot. The agents approached him, identified themselves as federal agents and asked to see identification. The defendant displayed his driver's license. Agent Anderson informed Canales that they wanted to question him concerning their belief that a Mexican male was carrying heroin.

DEA Agent Mihills testified at length concerning the agents' encounter with the defendant. He stated that, in response to the defendant's inquiry when first stopped, Special Agent Anderson informed Canales that they possessed information that a Mexican male would be transporting narcotics on the flight on which defendant was a passenger. The defendant then became very excited and demanded to know why he was the subject of such inquiry; that he had previously been approached by narcotics agents at the airport; that he was tired of the harassment; and that he wished to "have this all over once and for all." The defendant then asked whether the agents wanted to search him, at which point Special Agent Anderson said that the agents did wish to speak with him further.

It was at this point that Canales indicated his discomfort at continuing the conversation in front of his wife and stepson, and asked if the discussion had to occur right there. Agent Mihills' testimony as to the ensuing discussion indicates, in substance, that Special Agent Anderson advised Canales that the DEA had an airport office where the three could continue the conversation. When asked what the defendant's response to this information was, Agent Mihills testified:

Mr. Canales very positively stated that he wanted to go to that office and get this matter straightened out once and for all.

The witness further testified that Canales' wife and stepson went into a nearby lounge and the two agents and the defendant retired to the DEA office to talk.

Concerning the events transpiring in that office, the defendant continued to demand that the agents search him so that the alleged harassment of him in the airport by federal agents would cease; Canales further claimed, according to Agent Mihills, to be a reputable businessman and contended that he "did not feel that it was right" that he be harassed merely because he travelled back and forth to the Mexican border area. Agent Mihills described Canales' further disavowals of personal involvement with narcotics trafficking in this fashion:

He went further to say that if there was any question as to his entegrity [sic] or his character, that he wanted us, us being Special Agent Anderson and myself, to call certain telephone numbers that he gave us, one of which was his mother—he wanted us to call his mother to ask what type of person he was and if he would deal in narcotics at all, and then a number that he claimed to be some type of Mexican police official of some sort who would also vouch for his character.

The search of the defendant's person and briefcase followed shortly thereafter. When asked to describe the attendant circumstances, Agent Mihills stated:

Special Agent Anderson advised Mr. Canales that he did not have to submit himself to any type of search, that he was not required to, and that we would search him and his belongings but that he certainly wasn't required to.

Mr. Canales replied to that by demanding to be searched. He opened his briefcase and he said, here, look, and look at me, he pulled back his jacket in a fashion to examine his person   .   .   .

The witness admitted that no narcotics were found on Mr. Canales' person, and further stated that the defendant opened his briefcase and removed papers and folders from it in an attempt to show the agents that there were no narcotics in the briefcase.

During the defendant's display of his briefcase, Agent Mihills testified, he discovered baggage claim tickets stapled to airplane ticket stubs from Braniff Flight 400 bearing the name of either "Robert Canales" or "R. Canales." This discovery was made as Agent Anderson was asking the defendant whether he had any luggage; the agent commented parenthetically that Canales seemed to be "travelling light." At trial, Agent Mihills recalled Canales' response as follows:

> Mr. Canales said that that was correct, that he was travelling light, that he had gone down just the night before, that he had some business he had to take care of because he was an officer in a corporation and he had to go back and forth to that area of Texas to tend to the business of his corporation.

The witness was then asked whether the statement made by the defendant corresponded with the information given to him and Agent Anderson by the Detroit Police. Agent Mihills responded that the information was in conflict, since the police indicated having knowledge of Canales' departure at the airport several days earlier and his activities in Texas and Mexico during the intervening period.

The agents further questioned Canales relative to the baggage stubs, and asked him to explain their presence in light of his claim that he had no luggage. The witness' account of the conversation was that the defendant had replied that the baggage stubs were possibly from his brother's luggage since his brother was flying to Albuquerque. During the defendant's explanation, Agent Mihills continued to examine the baggage stubs and noted that they bore the designation "DTW" which, he believed, indicated that the bags' intended destination was Detroit Metropolitan Airport.

Agent Anderson then asked the defendant if he would mind going to the baggage claim area to see if luggage bearing corresponding baggage claim stubs was there; the defendant "readily agreed," at which point the threesome proceeded to that area. Agent Mihills testified further that Canales identified the baggage from a distance of about 50 to 60 yards; that Agent Anderson compared the numbers on Canales' ticket stubs with those on the luggage and found them to be identical; and that the defendant claimed the luggage and returned with the two agents to the DEA office.

Upon their return to the DEA office, Agent Anderson advised the defendant that he had the right to refuse the search of the luggage. The witness characterized the defendant's response in this way:

> Mr. Canales replied that he wanted the bags searched. He wanted this over once and for all and that he was extremely agitated about the whole situation and he wanted the searching to take place and to be over with so he could be on his way.

These bags were locked and each had a three-digit combination lock. Mihills testified that Agent Anderson told the defendant that the search could proceed only if the bags could be opened, and that Canales, stating that he had the combination, went over to the bags and unlocked them. Mihills then searched one of the bags and there found seven pounds of heroin. Canales was then informed that he was under arrest and signed a waiver of rights form.

Canales denied that he asked to be taken to a private place to be questioned, that he consented to any search, that he willingly accompanied the agents to the baggage claim area, and that the bags in which the heroin was found were his. He further claimed that he thought himself under arrest and feared being shot. The district judge found the government agent's testimony believable and resolved the conflict of evidence against Canales' version of the affair.

I

The question presented here is whether the DEA agents violated defendant Ca-

nales' Fourth Amendment right to be protected against "unreasonable searches and seizures." Initially, we confront the question of whether the agents were acting in accordance with the United States Constitution when they stopped the defendant outside the airport. The district judge found that the DEA agents lacked information which would have amounted to probable cause to believe the defendant was then committing, or had committed, a crime, and that there was thus insufficient cause for a warrantless arrest. We agree with that conclusion. The district judge found, however, that the investigative stop was made for sufficient cause. It is that conclusion that requires examination in light of the Fourth Amendment's general proscription against unreasonable searches and seizures.

In the event the initial stop is not deemed reasonable, the subsequent seizure of heroin would raise other grave constitutional questions. See, *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). An investigative stop is an "intrusion upon constitutionally guaranteed rights [and must be] based on [something] more substantial than inarticulate hunches." *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). In *United States v. McCaleb,* 552 F.2d 717 (6th Cir. 1977), this Court rejected the government's contention that a constitutional *Terry* stop had occurred and commented on the circumstances under which an investigative stop is constitutionally permissible.

> In addition, while a set of facts may arise in which the existence of certain profile characteristics constitutes reasonable suspicion, the circumstances of this case do not provide "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant[ed]" the intrusion of an investigatory stop. *Terry v. Ohio, supra,* 392 U.S. at 21, 88 S.Ct. at 1880; *United States v.*

*Cupps,* 503 F.2d 277, 281 (6th Cir. 1974). "Founded suspicion requires some reasonable ground for singling out the person stopped as one who was involved or is about to be involved in criminal activity." *United States v. Carrizoza-Gaxiola,* 523 F.2d 239, 241 (9th Cir. 1975). The activities of the appellants in this case observed by DEA agents, were consistent with innocent behavior.

As we recognize and reaffirm those standards, we must view the facts of *McCaleb* side by side with the facts of the case at bar in order to articulate those dissimilarities which cause us to arrive at a differing result.

In *McCaleb,* the government agents' stop of the defendant was based on the following:

> (1) Three persons arrived at the Detroit Airport on a non-stop flight from Los Angeles.
>
> (2) One person was carrying a shoulder bag; the others carried no luggage.
>
> (3) Two of the persons were seen boarding the plane for Los Angeles the previous evening wearing the same clothes.
>
> (4) Two of the persons appeared nervous; one did not.
>
> (5) McCaleb claimed one bag.

■ We described that behavior as "consistent with innocent behavior." Moreover, we noted that the above *McCaleb* facts did not satisfy the Detroit Airport "drug courier profile." ** The element missing in *McCaleb* and present in the case at bar is a reasonably inferred tie-in with unlawful trading in narcotics. Without repeating but calling attention to the facts inferential of Canales' suspected heroin connection and his trip to Mexico, the stop of Canales by experienced DEA agents amounted to a reasonable act in the performance of their duty.

** The "drug courier profile" is a rather loosely formulated list of characteristics used by Detroit DEA agents to indicate "suspicious" persons. These characteristics include: (1) the use of small denomination currency for ticket purchases; (2) travel to and from major drug import centers, especially for short periods of time; (3) the absence of luggage or use of empty suitcases; (4) nervousness, and; (5) use of an alias. DEA agents testified that the presence of a number of these characteristics suggests that the person observed may be carrying contraband drugs. *United States v. McCaleb,* 552 F.2d 717, 719–20 (6th Cir. 1977).

The agents' suspicion was not aroused for the first time at the airport on the date of his arrest; information obtained in the course of prior police surveillance had already made the defendant deserving of suspicion. Those suspicions were further intensified by the results of the surveillance of Canales in Texas and Mexico. The cumulative effect of these observations, and the reasonable inferences drawn therefrom, warranted an investigative stop of Canales.

In another case involving the Detroit Metropolitan Airport, this Court held that probable cause existed to arrest the defendant upon his arrival there. *United States v. Van Lewis*, 556 F.2d 385 (6th Cir. 1977). In *Van Lewis*, a ticket agent had noticed that the defendant fit the drug courier profile when he bought a ticket to Los Angeles. The ticket agent notified a DEA agent. This agent then investigated the purchaser and found:

> . . . that appellant had used an alias when paying for his ticket . . . that appellant had taken with him to Los Angeles one suitcase which was virtually empty; that appellant had a prior arrest for possession of heroin and had two non-drug related convictions; that appellant had left with American Airlines a telephone number to an apartment which was noticeably under surveillance for narcotics traffic; that appellant's personal residence was a place other than the apartment under surveillance for narcotics traffic, which supported the inference that the apartment under surveillance was a place used by appellant for narcotics traffic; and that appellant had returned to Detroit wearing the same clothes as when he had left. *Van Lewis, supra*, at 389.

Although the agents in *Van Lewis* possessed facts which were arguably more incriminating than those in this case, the Court was there concerned with the existence of probable cause to arrest. Like *Van Lewis*, and unlike *McCaleb*, the agents in the instant case had information, other than that resulting from the confrontation with the defendant at the airport, which suggested that Canales was presently, or in the past, connected with illegal narcotics traffic. *Van Lewis, supra*, at 391. We find that the facts upon which the agents acted in this case lie on a continuum between those determined not to amount to founded suspicion in *McCaleb* and those held sufficient to constitute probable cause in *Van Lewis*. Obviously, reasonable agents would recognize that Canales' travelling was potentially innocent and capable of explanation. However, their reasonable suspicions independently founded provided a sufficient nexus between the defendant's present behavior and criminal activity to justify the stop as the government's attempt to determine that his activity was, in reality, innocent activity.

II

Notwithstanding our holding that the agents' initial intrusion, the investigative stop, was constitutionally permissible, we must still consider the Fourth Amendment questions raised by the subsequent search of the defendant's belongings. As we have held before, *Terry* authorizes only a limited protective search for weapons and not a search of luggage for narcotics. *United States v. Hunter*, 550 F.2d 1066 (6th Cir. 1977); *United States v. Craemer*, 555 F.2d 594 (6th Cir. 1977). Therefore, unless there is some other factor present to justify the search, it is unconstitutional.

As a threshold matter, we must consider the holding of the district court that the defendant was not under arrest when he accompanied the agents to the DEA office. The defendant urges that the agents' action, in taking him to their office, constituted an arrest because they effectively deprived him of his liberty. A clear deprivation of liberty caused by law enforcement officials without formal words is nonetheless an arrest. See, *Manning v. Jarnigan*, 501 F.2d 408, 410 (6th Cir. 1974). The defendant claims, moreover, that the arrest was without probable cause.

However, the trial court found that Canales himself initiated the trip to the

DEA office so that the ensuing conversation would be accorded some measure of privacy. If this finding is not clearly erroneous, the defendant's presence in the DEA office was as a volunteer and not an arrestee. That the defendant would request to be taken to the DEA office so that the conversation would be outside the presence of his wife and stepson could be viewed as somewhat extraordinary. However, it is not so incredible that it requires this Court to find it clearly erroneous.

Concomitantly, Agents Mihills and Anderson testified that while in the DEA office, Canales maintained his innocence and invited a search to demonstrate to the agents that he was not carrying any illegal substances. Once inside the room he insisted on being searched and, in fact, opened his briefcase and held open his jacket. The agents testified that they told him of his right not to be searched without his consent. To the contrary, Canales stated that he felt that he was under arrest, feared that he would be shot, and feared for his wife and stepson; he further claimed that his briefcase was searched without any request for his consent, and that he was strip searched.

This sharp fact conflict was resolved in favor of the government by the district judge. The court held that the defendant had consented to the searches, and that at the time of the searches he was not under any physical restraint. The final issue presented by this appeal is whether this finding by the district judge is clearly erroneous. If the appellant voluntarily consented to the search of his luggage, the applicable law is clear; this Court has previously held that consent searches are reasonable and thus may be conducted lawfully without a search warrant. *United States v. Hearn*, 496 F.2d 236 (6th Cir. 1974).

■ Inherent in a finding of consent in this context is the consideration of whether the consent was "voluntary." The Supreme Court in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), set forth the guidelines applicable in determining the voluntariness of consent.

The issue of voluntariness "is a question of fact to be determined from the totality of all the circumstances," and the prosecution "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Schneckloth* at 222 and 223, 93 S.Ct. at 2045. Since we do not find the district judge's findings and conclusions on this issue clearly erroneous, we conclude that the government has shown by substantial evidence that the search of the briefcase and the seizure of the baggage claim tickets found therein was preceded by the requisite voluntary consent.

It is undisputed that the two agents and Canales went to the baggage claim area where two bags were claimed, the numbered tags of which corresponded with the claim tickets. The district court, after hearing conflicting evidence, decided that Canales "accompanied the agents to the baggage claim area without being under any physical restraint." The Court further found that the agents, noting the bags had combination locks, asked Canales for the combinations only after again informing him of his right to refuse consent to the search. At that point, Canales opened the bags and the heroin was discovered.

The defendant stated that he did not know whether the bags were his or not, that he gave the lock combinations to the agents, and that he was in fear at the time. The latter statement, if believed, could reasonably support an inference that the consent was not voluntary. But the district judge chose to believe the testimony of the agents. This Court cannot make its own decision as to which witnesses are most credible. That is in the province of the factfinder. Considering the facts before us, we cannot hold the district judge's finding to be clearly erroneous.

The defendant not having been subject to custodial questioning prior to the discovery of the heroin, the giving of *Miranda* warnings was not required.

We affirm the district court's ruling denying the motion to suppress the evidence, and therefore affirm the defendant's conviction.

Affirmed.