UNITED STATES of America, Appellee,

v.

**Mark Donald DEGGENDORF, Appellant.**

No. 79–1974.

United States Court of Appeals,
Eighth Circuit.

Submitted March 14, 1980.

Decided July 1, 1980.

Rehearing and Rehearing en Banc
Denied July 30, 1980.

Larry R. Townsley, Cofman, Townsley, Nissenholtz & Weinstein, St. Louis, Mo., argued; David M. Nissenholtz, St. Louis, Mo., on brief, for appellant.

Mitchell F. Stevens, Asst. U. S. Atty., St. Louis, Mo., for appellee; Robert D. Kingsland, U. S. Atty., St. Louis, Mo., on brief.

Before BRIGHT, ROSS and ARNOLD, Circuit Judges.

BRIGHT, Circuit Judge.

Mark Donald Deggendorf appeals his conviction for possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1)(1976). Deggendorf claims that the district court[1] erred 1) in denying his motions to quash a search warrant and to suppress evidence seized pursuant to that warrant; 2) in denying his motion for a change of venue or, in the alternative, a continuance; and 3) in admitting certain hearsay statements into evidence. We find no prejudicial error and accordingly affirm.

I. *Background.*

The story of Mark Deggendorf's arrest begins at an airport security checkpoint in Orlando, Florida, on the morning of September 14, 1979. A passenger bound for St. Louis, Missouri, approached the checkpoint carrying a brown Smith Corona typewriter case. The case caught the attention of a security officer because she was unable to discern any of its contents through the x-ray machine. The security officer asked the passenger to open the case and, after stating that the case just contained clothes, the passenger complied with the request. Upon inspecting the contents, the security officer found tennis shoes, clothing, and a large brown envelope.

The passenger claimed that the envelope also contained clothing, and attempted to retrieve it. The security officer ran the envelope back through the x-ray machine and determined that it did not contain clothing. At this point, an Orlando police officer on airport duty joined in the examination of the envelope. The officer picked up the envelope, squeezed and smelled it. The officer observed that the contents felt bendable or granular in nature. Informed that he could not board the airplane with the package in his possession, the passenger returned the envelope to the typewriter case and forwarded that case as baggage on the airplane.

Suspecting that the envelope contained drugs, the Orlando police officer called the local office of the Drug Enforcement Administration (DEA). The police officer gave a full account of the checkpoint inci-

---

1. The Hon. H. Kenneth Wangelin, Chief Judge, United States District Court for the Eastern District of Missouri.

dent, including a description of the passenger and his destination. The Orlando DEA office in turn telephoned the St. Louis Office of the DEA. Meanwhile, the passenger made a telephone call and then boarded the plane.

At approximately 11:15 a. m. on the same date, DEA agents in St. Louis observed the passengers arriving from Orlando on the flight designated by the DEA agent in Florida. A man fitting the description given by the Florida agent walked from the gate to the main concourse and met another man. Two informants, who were accompanying the DEA agents, identified the passenger's companion as a cocaine user and dealer named Steven Schmidt.

The passenger and Schmidt walked to the luggage carousel, where a DEA agent moved in close enough to hear part of their conversation. The passenger indicated that he had been stopped in Orlando but felt he had "put one over on them." Schmidt replied: "When I got your call I didn't know what to think. * * * Well, we'll know if everything is all right when the bag gets here."

The passenger and Schmidt picked up two pieces of luggage at the baggage carousel: a brown Smith Corona typewriter case and a large suitcase. As the men headed for the airport exit, DEA Agents Fergus and Dunham and a St. Louis detective approached them. Agent Fergus identified himself, showed his badge, and asked the passenger and Schmidt to accompany him to the police room. Enroute, essentially the following interchange took place between Agent Fergus and the passenger:

Fergus: Do you have an airplane ticket?
Passenger: No.
Fergus: Do you have any identification?
Passenger: No.
Fergus: What is your name?
Passenger: Mark.
Fergus: Mark what?
Passenger: Mark Deggendorf.

After staying three to four minutes in the police room, the agents decided to bring the two men and the luggage to the United

States Attorney's office and to apply for a warrant to open and search the typewriter case. While at that office, Agent Dunham saw Deggendorf attempt to discard baggage claim checks for the luggage. Deggendorf also peeled the name tag off the large suitcase and tried to discard it.

Before applying for a search warrant, the agents supplemented their investigation. The St. Louis detective and the two informants went from the airport to an address where, according to the informants, Schmidt resided. The detective ran a license check on the vehicle in the driveway and found that it was registered to Steven Schmidt at that address. DEA Agent Fergus ran the name Mark Donald Deggendorf through the Narcotics and Dangerous Drugs Information System (NADDIS) computer and learned that Deggendorf had been arrested in Bogota, Colombia, for conspiring to traffic in cocaine.

Agent Fergus incorporated the foregoing facts into an affidavit in support of a warrant to search the typewriter case. On the afternoon of the same day that Deggendorf arrived in St. Louis, a federal magistrate issued a search warrant. The resulting search of the envelope in the typewriter case disclosed two clear plastic bags containing what was subsequently determined to be 368.05 grams of cocaine. The cocaine was approximately seventy-five percent pure and had a wholesale value of $79,000 and a street value of $147,000.

Prior to trial, Deggendorf moved to suppress the cocaine on the ground that the facts alleged in the affidavit were insufficient to support the search warrant. In connection with this motion, Deggendorf asserted that some of the facts were tainted by his purportedly illegal arrest. The district judge adopted the recommendation of the magistrate who had heard Deggendorf's motion to suppress, and denied the motion.

Deggendorf now appeals the denial of his motion to suppress. In addition, Deggendorf appeals the district court's denial of two other motions: a request for a change of venue or, in the alternative, a continuance, based upon two potentially prejudicial

newspaper articles published shortly before trial; and a motion to exclude a portion of Agent Fergus' testimony as hearsay. We discuss these motions separately.

## II. *The Motion to Suppress.*

Deggendof claims that the trial court should have suppressed the cocaine because the affidavit did not state sufficient facts to establish probable cause to search. In support of this claim, Deggendorf argues that certain of the facts in the affidavit are tainted by the unreliability of the informants, and others by the illegality of his arrest.

■ In reviewing the sufficiency of an affidavit for a search warrant, we must assess the question of probable cause pragmatically. As the Supreme Court stated in *United States v. Ventresca,* 380 U.S. 102, 109, 85 S.Ct. 741, 746, 13 L.Ed.2d 684, 689 (1965):

> where [the underlying] circumstances are detailed, where reason for crediting the source of the information is given, and when a magistrate has found probable cause, the courts should not invalidate the warrant by interpretating the affidavit in a hypertechnical, rather than a common sense, manner.

*See also United States v. House,* 604 F.2d 1135, 1142 (8th Cir. 1979). Our basic inquiry is whether the affidavit established "the probability of criminal activity and the concealment of evidence on specific premises. Proof beyond a reasonable doubt is not required." *United States v. Taylor,* 599 F.2d 832, 836 (8th Cir. 1979) (citations omitted). With these guidelines in mind, we analyze the affidavit in this case.

■ Deggendorf first challenges the reliability of the informants who identified Schmidt as a cocaine dealer and user. The Supreme Court, in *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729 (1964), announced a two-prong test of the adequacy of a statement by an unidentified informant:

> [T]he magistrate must be informed of [1] some of the underlying circumstances from which the informant concluded that the narcotics were where he claimed they were, and [2] some of the underlying circumstances from which the officer concluded that the informant, whose identity need not be disclosed * * * was "credible" or his information "reliable." [*Id.* (citation and footnote omitted).]

Applied to this case, *Aguilar* requires that the affidavit state 1) sufficient underlying circumstances from which the informants could conclude that the man at the airport was Steven Schmidt and that Schmidt was a cocaine user and dealer; and 2) sufficient underlying circumstances from which the officers could conclude that these informants were credible or their information was reliable.

This court has consistently held that an informant's statement that he or she personally observed the alleged transaction satisfies the first prong of the *Aguilar* test. *United States v. Holmes,* 594 F.2d 1167, 1170 (8th Cir.), *cert. denied,* 100 S.Ct. 154, 62 L.Ed.2d 100 (1979); *United States v. Wedelstedt,* 589 F.2d 339, 348 (8th Cir. 1978), *cert. denied,* 442 U.S. 916, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Gavic,* 520 F.2d 1346, 1350 (8th Cir. 1975).[2] In this case, the affidavit states that the informants personally observed Schmidt purchase and use cocaine. They also observed the man at the airport and identified him as Schmidt. Accordingly, we conclude that the affidavit meets the first requirement of *Aguilar.*

*Aguilar*'s second prong focuses on the credibility of the informant. This affidavit contains two facts which support the credibility of these informants. First, one of the informants stated that he had used cocaine with Schmidt as recently as eight months prior to his identification at the airport. As an admission against penal interest, this statement "carr[ies its] own indicia of credibility." *United States v. Harris, supra,* 403

---

2. *Compare Spinelli v. United States,* 382 F.2d 871 (8th Cir. 1967) (*en banc*), *rev'd,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), *with*

*United States v. Harris,* 403 U.S. 573, 585–86, 91 S.Ct. 2075, 2082–83, 29 L.Ed.2d 723 (1971) (Blackmun, J., concurring).

U.S. at 583, 91 S.Ct. at 2081 (plurality opinion); *see United States v. Holmes, supra,* 594 F.2d at 1170. Second, independent police investigation corroborated the information about Schmidt's residence. We conclude that these facts provide adequate assurance of the informants' credibility.

Based on the foregoing, we conclude that there was a "substantial basis" for crediting the informants' statements. Accordingly, we hold that the trial court properly considered these facts in determining whether probable cause supported the warrant. *See United States v. Holmes, supra,* 594 F.2d at 1171.

■ Deggendorf next challenges the affidavit on the ground that its last four paragraphs are the product of his allegedly illegal arrest.[3] Integral to this challenge is Deggendorf's claim that he was illegally arrested when Agent Fergus escorted him to the airport's police room. The Government maintains that either Agent Fergus had probable cause to arrest Deggendorf at the airport, or this was a *Terry*-type stop, not an arrest. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The magistrate concluded that there was probable cause to arrest Deggendorf at the airport exit. We disagree.

At the time Agent Fergus approached Deggendorf, he knew essentially three facts: 1) a man fitting Deggendorf's description had refused to open an envelope in Orlando; 2) at St. Louis, the passenger met Schmidt, a cocaine user and dealer; and 3) the passenger and Schmidt were worried about and then retrieved the brown typewriter case. We do not consider these facts "sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v.*

*Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964) (citations omitted); *United States v. Matthews,* 603 F.2d 48, 51 (8th Cir. 1979) and cases cited therein. Rather, we conclude that this information "was sufficient to justify a reasonable suspicion of criminal activity which warranted further investigation * * *." *United States v. Williams,* 604 F.2d 1102, 1125 (8th Cir. 1979); *see United States v. Canales,* 572 F.2d 1182, 1185–87 (6th Cir. 1978).

Having determined that the agents had "a reasonable suspicion, based on objective facts, that [Deggendorf was] involved in criminal activity[,]" *Brown v. Texas,* 443 U.S. 47, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979) (citations omitted), we must determine whether Deggendorf's fourth amendment protections were violated when the agents escorted him to the police room at the airport. This issue arose on similar facts in a recent case before the Supreme Court. *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). In that case, after some initial questioning about the passenger's identity, a DEA agent asked her "if she would accompany him to the airport DEA office for further questions." *Id.* at ——, 100 S.Ct. at 1874. The passenger acquiesced by following the agent up a nearby flight of stairs to the office. Analyzing these facts in light of the totality of all the circumstances, a majority of the Court concluded that the evidence was "plainly adequate to support the District Court's finding that the [passenger] voluntarily consented to accompany the officers to the DEA office." *Id.* at ——, 100 S.Ct. at 1879.

We apply a similar analysis to the facts underlying the present appeal.[4] As in *Men-*

---

**3.** These four paragraphs recount 1) the passenger's identification of himself as Mark Deggendorf to Agent Fergus; 2) the St. Louis detective's verification of Schmidt's residence; 3) discovery of South American drug charges against Deggendorf via the NADDIS computer; and 4) observation of Deggendorf's attempt to discard a baggage tag and two claim checks at the United States Attorney's office.

**4.** Although the district court did not reach the issue of voluntariness, it did adopt the magistrate's findings which included a description of the airport encounter. The magistrate found that

Agent Fergus stepped forward and identified himself with his badge as a DEA agent. He asked them [Deggendorf and Schmidt] to accompany him to the airport police room 200 to 250 feet away.

*denhall,* Deggendorf "was not told that [he] had to go to the office, but was simply asked if [he] would accompany the officers. There were neither threats nor any show of force." *Id.* at ——, 100 S.Ct. at 1879. Moreover, nothing in this record suggests that Deggendorf was unusually susceptible to coercion because of the inherent authority of the DEA agents. *Cf. id.* at ——, 100 S.Ct. at 1879 (individual characteristics that suggest vulnerability to authority are relevant in considering the totality of the circumstances).

Upon careful review of the record, we conclude that the Court's ruling in *United States v. Mendenhall* controls our disposition of the fourth amendment seizure issue. Because Deggendorf voluntarily consented to accompany the DEA agents to the police room, no constitutional violation tainted the information which he supplied to the officers on the way to the police room.

 We do not reach the issue of whether there was probable cause to arrest Deggendorf when the agents took him from the airport to the United States Attorney's office. Clearly an arrest had occurred by that time. *See Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2249, 60 L.Ed. 824 (1979). The only information in the affidavit obtained from the detention in the United States Attorney's office, however, concerns Deggendorf's attempt to discard a baggage tag and two claim checks. Assuming, *arguendo,* that this information was tainted, its exclusion would not invalidate the warrant: the other facts in the affidavit are sufficient to establish probable cause to search the typewriter case.[5]

For the foregoing reasons, we hold that the trial court did not err in denying Deggendorf's motion to suppress the cocaine.

---

The magistrate's report, as noted in the dissent at 11–12 *infra,* states that a DEA agent "directed" Deggendorf and Schmidt to the police room. The term "directed" refers to letting Deggendorf and Schmidt "know where they were going." [Transcript Suppression Hearing at 31.]

5. Deggendorf did not object to the Government's retention of the baggage as being a fruit

---

### III. *The Motion for a Change of Venue or, in the Alternative, A Continuance.*

 Deggendorf claims that he was denied a fair and impartial trial by the presence of adverse pretrial publicity.[6] He appeals the trial court's denial of his motions for a change of venue or, alternatively, a continuance. We affirm on the ground that the trial court did not abuse its discretion.

A motion for transfer under Fed.R. Crim.P. 21(a) based upon prejudicial pretrial publicity is addressed to the sound discretion of the district court. *United States v. Buttorff,* 572 F.2d 619, 627 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978); *United States v. Brown,* 540 F.2d 364, 377 (8th Cir. 1976). Similarly, the district court has broad discretion to rule on the appropriateness of a continuance. *United States v. Lankford,* 573 F.2d 1051, 1054 (8th Cir. 1978) and cases cited therein. Upon reviewing the record, we cannot say that the court abused its discretion in denying these motions.

### IV. *The Motion to Exclude Certain Evidence as Hearsay.*

 Finally, Deggendorf claims that the district court, in admitting hearsay testimony of a coconspirator's statement, failed to comply with the procedures which we set out in *United States v. Bell,* 573 F.2d 1040, 1044 (8th Cir. 1978). Specifically, Deggendorf attacks the trial court's failure to wait until the close of all the evidence to rule on the admissibility of testimony by Agent Fergus in which he recounted statements made by Steven Schmidt. The Government points out that although the district court ruled prematurely, it did make all the requisite findings at the close of the prosecution's case.

---

of the likely illegality of his arrest and continued detention at the United States Attorney's office. Hence, that issue is not presented to us on this appeal.

6. Shortly before trial, a St. Louis newspaper published two articles about cocaine traffic from Colombia to southern Florida; the articles did not refer to Deggendorf.

We find Deggendorf's argument meritless. First, the procedure here substantially comports with that outlined in *Bell*. *See United States v. Smith*, 596 F.2d 319, 321–22 (8th Cir. 1979). Second, we see no way in which the court's noncompliance prejudiced the appellant. Judge Matthes, who authored *Bell*, observed in a recent opinion:

It should be made clear that the guidelines established in *Bell* are flexible and are not infallible, and we should hesitate to fault a trial court for failure to comply literally with the procedures enunciated in *Bell*. [*United States v. Littlefield*, 594 F.2d 682, 686 (8th Cir. 1979).]

We hold that the trial court's failure to make a finding at the end of all the evidence did not constitute reversible error in this case. *See United States v. Smith, supra; United States v. Morton*, 591 F.2d 483 (8th Cir.), *cert. denied*, 441 U.S. 950, 99 S.Ct. 2177, 60 L.Ed.2d 1054 (1979). At the same time, we suggest that diligent observance of the *Bell* procedures will avoid these recurring issues on appeal.[7]

## V. *Conclusion.*

For the foregoing reasons, we affirm the judgment of the district court.

ARNOLD, Circuit Judge, concurring in part and dissenting in part.

I agree with the Court's opinion in all but one respect. In my view, agent Fergus acted without authority of law when he directed Deggendorf and Schmidt to the police room, and the evidence that was obtained as a result should have been suppressed.

The facts are stated in the Court's opinion, and will not be repeated here. I do submit, however, that one important aspect of the findings made below is omitted. As Deggendorf and Schmidt were walking towards the airport exit with their bags, agent Fergus stepped forward and identified himself as an officer of the Drug Enforcement Administration. As the Court notes, *ante*, p. 52 n. 4, the United States Magistrate found, and the finding was adopted by the District Court, that agent Fergus "asked" Deggendorf and Schmidt "to accompany him to the airport police room 200 to 250 feet away." This quotation from the findings made below leaves the impression that Deggendorf was not under compulsion. This impression cannot survive a reading of the entire report and recommendation of the United States Magistrate on defendant's motion to quash the search warrant and suppress evidence. The report states, for example, that "agent Fergus *directed*" (emphasis supplied) Deggendorf and Schmidt to the police room. Designated Record (D.R.) 6. "At the time neither Deggendorf nor Schmidt were handcuffed, but *Fergus would not have allowed Schmidt or Deggendorf to leave the airport area if they so desired.*" (Emphasis supplied). *Ibid.* The District Court adopted the report in its entirety.

In view of these findings, I do not understand how it can be said that "Deggendorf voluntarily consented to accompany the DEA agents to the police room . . .," *ante*, p. 53. If the District Court had found that Deggendorf had voluntarily cooperated with the agents, perhaps the finding could be supported under the clearly-erroneous rule. No such finding was made. Indeed, this Court takes the position, *ante*, at p. 52 n. 4, that "the District Court did not reach the issue of voluntariness . . ." One should recall, in addition, that the Government has the burden of proof on the issue of voluntariness, *e. g., Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973).

I think this case is controlled by *Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979), where the Supreme Court said:

detention for custodial interrogation—regardless of its label—intrudes so severely on interests protected by the Fourth Amendment as necessarily to trigger the traditional safeguards against illegal arrest.

---

**7.** *See United States v. Littlefield, supra*, 594 F.2d at 686.

The Supreme Court's description of the degree of restraint to which Dunaway was subjected is strikingly similar to the finding made by the court below in this case: "Petitioner was taken into custody; although he was not told he was under arrest, he would have been physically restrained if he had attempted to leave." *Dunaway v. New York, supra,* 442 U.S. at 203, 99 S.Ct. at 2251. To be sure, *Dunaway* is not identical. There, the suspect was taken from a neighbor's house to the police station for questioning. Here, Deggendorf was transported a much shorter distance, from the airport exit to a private detention room. In both cases, however, a citizen was forcibly deprived of his liberty by being compelled by the State to go to a place where he did not wish to be. In both cases the purpose was interrogation.

I do not agree that *United States v. Mendenhall,* —— U.S. ——, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), is controlling. In that case, "[t]he District Court specifically found that the respondent accompanied the agents to the office . . . voluntarily in a spirit of apparent cooperation. . ." *Id.* at ——, 100 S.Ct. at 1879. The Supreme Court's opinion, as I read it, turns upon this key finding by the trier of fact. No such finding was made here. In short, Ms. Mendenhall voluntarily accompanied the agents who accosted her; Deggendorf did not.

If, as the opinion of Mr. Justice Stewart in *Mendenhall* states, the subjective intention of the agents to detain Deggendorf were irrelevant, a different result might follow. This portion of the opinion, however, was joined by only one other member of the Court. *See* —— U.S. ——, ——, ——, n. 6, ——, 100 S.Ct. 1870, 1873, 1877, 1881, 64 L.Ed.2d 497.

Nor can the conduct of the agents in this case be justified under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). If the agents had simply questioned Deggendorf at the baggage carousel or the airport exit, *Terry* might be apposite. Much more happened here. Deggendorf was detained for investigation and questioning in an enclosure set aside by the police for that purpose.

I cannot agree that this deprivation of liberty, concededly without probable cause, can be justified under the Fourth Amendment. This case involves one of the core values of the Bill of Rights: that the physical liberty of the citizen to move about from place to place not be forcibly taken away by the State unless there is probable cause to believe that the citizen has committed or is committing a crime.

I respectfully dissent.