887 F.2d 1088
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James R. BARNETT, Defendant-Appellant.
 No. 89-5198.
 United States Court of Appeals, Sixth Circuit.
 Oct. 17, 1989.
 
 Before BOYCE F. MARTIN, Jr., and MILBURN, Circuit Judges and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 James R. Barnett appeals his conviction arising from the robbery of a federally insured financial institution. Count 1 of the superseding indictment charged appellant with robbing a federally insured institution in violation of 18 U.S.C. Sec. 2113(a). Count 2 of the superseding indictment charged appellant with placing lives in jeopardy while committing the robbery in violation of 18 U.S.C. Sec. 2113(d). Count 3 of the superseding indictment charged appellant with the use of a firearm during the commission of the bank robbery in violation of 18 U.S.C. Sec. 924(c)(1).
 
 I.
 
 2
 At approximately noon on July 20, 1988, a male wearing a ski mask robbed the First Nationwide Bank located at 3501 Bardstown Road in Louisville, Kentucky. Along with the ski mask the robber wore dark pants and a khaki shirt. The robber pointed a gun at the branch manager and instructed her and the other two bank employees present to fill a plastic garbage bag with money from the teller drawers. Complying with the robber's demand, one of the tellers surreptitiously slipped "bait money" containing a dye bomb into the plastic bag. During the robbery a customer unwittingly entered the bank and was ordered to the floor. The robber hurriedly left the bank after threatening to kill anyone attempting to call the police.
 
 
 3
 Immediately after leaving the bank the dye bomb exploded in the robber's plastic bag emitting smoke and red dye. Removing his ski mask, the robber threw down the plastic bag and ran. A passenger in a nearby car, Kay Coleman, seeing these events became suspicious. She and her brother, the driver of her car, followed the robber as he ran to his parked car. Coleman recorded the car's make, color and license plate number, then proceeded to the bank where she handed this information to a teller.
 
 
 4
 The teller immediately notified the police who then broadcast the automobile's description over the police radio. Detective Neckar of the Louisville Police Department observed the described car at approximately 12:10 p.m. The car was being driven by the appellant, Barnett. Detective Neckar approached appellant's car and identified himself as a police officer. The appellant sped away with Detective Neckar in pursuit.
 
 
 5
 During the chase Detective Neckar observed the appellant throw items from his automobile. Detective Neckar broadcast this information over the police radio. Federal Bureau of Investigation (FBI) Agent Austin heard the broadcast, proceeded to the specified area, searched the ground and recovered a wool cap with eye spaces cut out, a gun, and a khaki shirt. The khaki shirt and mask were later identified by the bank tellers as being identical to those worn by the robber.
 
 
 6
 With Detective Neckar in pursuit, the appellant turned into an alley and rammed a Louisville police car driven by Officer Lindeman who was also responding to the call. As a result of the collision Officer Lindeman sustained a back injury and appellant suffered a minor cut to his forehead. Appellant, wearing dark pants and a white shirt, was immediately read his Miranda rights. FBI Agent Walkowiak testified in district court that the appellant appeared perfectly coherent after arriving at the police station and was fully able to comprehend the circumstances.
 
 
 7
 Appellant was asked if he would consent to having his car searched after it was towed to the police station from the accident scene. Appellant consented and signed a waiver. The search of appellant's car revealed at least two plastic garbage bags and thirteen live rounds of ammunition. Subsequently, the appellant informed the police officers that he wished to exercise his right to counsel before discussing the matter further. The police contacted the Jefferson County Public Defender's Office and requested that an attorney be assigned to assist the appellant. An attorney was immediately assigned.
 
 
 8
 With his attorney present, the appellant was placed in a lineup with four other men. Kay Coleman positively identified the appellant as the robber. Her brother, however, identified appellant and one other man, but could not make a positive identification beyond that.
 
 
 9
 On August 15, 1988, a federal grand jury indicted the appellant in a two count indictment to which appellant entered a plea of not guilty on September 9, 1988. On November 7, 1988, a three count superseding indictment was filed charging appellant with robbing a federally insured institution (in violation of 18 U.S.C. Sec. 2113(a)), placing lives in jeopardy while committing the robbery (in violation of 18 U.S.C. Sec. 2113(d)), and using a firearm during the bank robbery (in violation of 18 U.S.C. Sec. 924(c)(1)).
 
 
 10
 The jury trial began on November 22, 1988, and appellant was found guilty on all three counts. Barnett was sentenced on January 31, 1989, after arguments were heard regarding restitution for property damage and compensation. Pursuant to the Sentencing Reform Act of 1984, Counts 1 and 2 of the superceding indictment merged and appellant was sentenced to 57 months. Appellant was sentenced an additional 60 months for Count 3, the time to be served consecutively for a total sentence of 117 months. Appellant was also ordered to pay a special penalty assessment of fifty dollars per count for a total of $150.00, and ordered to pay restitution of $11,833.08 forty-eight months after release.[1]
 
 
 11
 This timely appeal followed.
 
 II.
 A.
 
 12
 The appellant first contends that he signed the consent to search his automobile under coercive circumstances after he had requested counsel. "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973). "The district court's findings with regard to voluntariness will not be reversed unless clearly erroneous." United States v. Jones, 846 F.2d 358, 360 (6th Cir.1988) (per curiam).
 
 
 13
 [A] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.... "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.
 
 
 14
 Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74 (1985) (citations omitted).
 
 
 15
 At a suppression hearing held prior to appellant's trial, the district court found no evidence of coercion or police misconduct:
 
 
 16
 I, as a matter of fact, find from this evidence that there has been no showing of any coercive circumstances with respect to the obtaining of this consent to search; and the evidence has actually been greatly to the contrary that the defendant made a knowing and voluntary consent to the Police Department to search the vehicle and that the police officers handled the situation professionally and very meticulously in order to assure that this was documented....
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 There has been no showing here that the defendant was tricked or maneuvered or pressured into signing this. The defendant is an educated individual. He's already revealed that to me in our earlier proceeding. I find that there is simply no showing here that this was other than was stated by the police officers who were present, and that was a voluntary and knowing decision on Mr. Barnett's part to consent to the search of his vehicle; therefore, the motion to suppress will be denied.
 
 
 20
 Record at Vol. I, 85-86.
 
 
 21
 Although the record does reflect an uncertainty as to the sequence of events regarding appellant's request for counsel and his signing of the consent to search his automobile, factual findings by the district court must stand unless clearly erroneous. United States v. Scott, 578 F.2d 1186, 1189 (6th Cir.), cert. denied, 439 U.S. 870 (1978). Though appellant was briefly handcuffed to a chair while medical personnel attended to the wound on his forehead, he was not handcuffed when he was taken to be questioned. Furthermore, numerous police officers who saw appellant upon his arrival at the police station stated that the injury to appellant's forehead was minimal and that appellant appeared coherent and fully cognizant.
 
 
 22
 Appellant contends that he requested counsel prior to his signing the consent to search his automobile and that the police officers ignored his request. The police officers' testified that appellant requested counsel after he signed the consent and that appellant's request for counsel was honored immediately. Appellant's contention, if believed, could reasonably support an inference that the consent followed a violation of appellant's sixth amendment right to counsel. However, the district court jury chose to believe the testimony of the police officers. This court cannot make its own decision as to which witnesses are most credible. That is the province of the factfinder. United States v. Canales, 572 F.2d 1182, 1188 (6th Cir.1978). The district court's findings that consent was freely and voluntarily given, and that appellant's sixth amendment right to counsel was not violated, were not clearly erroneous.
 
 B.
 
 23
 Prior to trial appellant requested that the prosecution be ordered to furnish the names and addresses of all eyewitnesses who were unable to identify appellant in a lineup. The district court denied this motion. Appellant renewed this motion at trial, but it was again denied. Appellant now contends that reversible error occurred when the government failed to disclose the identity of any eyewitness favorable to the appellant.
 
 
 24
 The Supreme Court has held that suppression by the prosecution of evidence favorable to an accused who has requested it violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83 (1963). "A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant." Id. at 87-88.
 
 
 25
 However, the Supreme Court later emphasized that:
 
 
 26
 [t]he Brady rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur. Thus, the prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.
 
 
 27
 United States v. Bagley, 473 U.S. 667, 675 (1985) (footnotes omitted). Similarly, the Court in Weatherford v. Bursey, 429 U.S. 545 (1977), held:
 
 
 28
 It does not follow from the prohibition against concealing evidence favorable to the accused that the prosecution must reveal before trial the names of all witnesses who will testify unfavorably. There is no general constitutional right to discovery in a criminal case, and Brady did not create one; as the Court wrote recently, "the Due Process Clause has little to say regarding the amount of discovery which the parties must be afforded...."
 
 
 29
 Id. at 559 (citations omitted).
 
 
 30
 The Due Process Clause is violated when the government obtains a conviction by means of perjured testimony, by withholding a confession of guilt by someone other than the accused, or by withholding evidence "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." United States v. Presser, 844 F.2d 1275, 1281 (6th Cir.1988) (quoting United States v. Agurs, 427 U.S. 97, 107 (1976)).
 
 
 31
 [U]nless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose.... [T]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.
 
 
 32
 United States v. Agurs, 427 U.S. at 108.
 
 
 33
 Although the Brady rule imposes a general obligation on the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the Supreme Court has held that the government typically is the sole judge of what evidence in its possession is subject to disclosure. United States v. Presser, 844 F.2d at 1281 (citing Pennsylvania v. Ritchie, 107 S.Ct. 989, 1003 (1987); United States v. Bagley, 473 U.S. at 682-83). If the government does fail to disclose Brady material, the defendant has a constitutional remedy for the nondisclosure only if the defendant is able to show that there is a reasonable probability that the omission deprived him of a fair trial. United States v. Agurs, 427 U.S. at 108.
 
 
 34
 Appellant cites no authority for the proposition that a lineup witness list must be offered to a defendant in a criminal trial. Though not directly dispositive of this issue, yet closely related, the Sixth Circuit has repeatedly held that defense counsel is not entitled to know in advance of trial who will testify for the government. United States v. McCullah, 745 F.2d 350, 353 (6th Cir.1984); United States v. Dark, 597 F.2d 1097, 1099 (6th Cir.), cert. denied, 444 U.S. 927 (1979).
 
 
 35
 Appellant contends that Kay Coleman's brother, the driver of the car that followed appellant and recorded his license plate number, failed to identify appellant at the lineup, thereby constituting exculpatory evidence to which he was entitled. This assertion fails to recognize that Coleman's brother narrowed his selection to two men, appellant and the man next to him. Such evidence can hardly be deemed exculpatory, the suppression of which would deprive appellant of a fair trial. Appellant's argument must, therefore, fail.
 
 C.
 
 36
 Appellant alleges that insufficient evidence was presented in district court to prove that First Nationwide Bank was insured by the Federal Savings and Loan Insurance Corporation (FSLIC) at the time of the robbery. Appellant further argues that a certificate showing the bank to be FSLIC insured should have been deemed inadmissible hearsay.
 
 
 37
 The district court admitted the testimony and documentation regarding the federally insured status of the bank pursuant to Fed.R.Evid. 803(6), the "business records" exception to the hearsay rule, Fed.R.Evid. 802. Several of First Nationwide Bank's personnel testified to their personal knowledge that the bank was FSLIC insured. In addition, a district manager for First Nationwide, deemed qualified by the district court, authenticated a certificate that indicated First Nationwide to be federally insured at the time of the robbery.
 
 
 38
 In United States v. Riley, 435 F.2d 725 (6th Cir.1970), this court held that a Federal Deposit Insurance Corporation's certificate, properly identified by a bank employee, was an admissible business record in a bank robbery prosecution:
 
 
 39
 Both appellants also contend that the government failed to make out a prima facie case because it didn't prove the Federal Deposit Insurance Corporation coverage. Actually, the government introduced the Federal Deposit Insurance Corporation certificate, properly identified by an auditor for the bank, as proof of such insurance. We hold that this is an admissible business record and that the evidence was sufficient to establish the insurance for purposes of federal jurisdiction.
 
 
 40
 Id. at 726. A similar result was reached in United States v. Rowan, 518 F.2d 685 (6th Cir.), cert. denied, 423 U.S. 949 (1975), which held that an FDIC certificate is kept in the ordinary course of banking business and is an admissible business record. "We hold that although the Government might have laid a better foundation, there is no doubt whatsoever that an FDIC certificate is kept in the ordinary course of a banking business and that it is an admissible business record." Id. at 693.
 
 
 41
 Because sufficient evidence to show the bank's federally insured status was presented by the government, appellant's third assignment of error must fail.
 
 D.
 
 42
 Appellant argues that the district court improperly increased his offense level from the base level of 18, which appellant concedes is the correct base level, to 22. United States Sentencing Commission Guidelines Manual, Sec. 1B1.1, Application Instructions, instructs the sentencing court to apply any appropriate specific offense characteristic from the applicable section of Chapter Two (Offense Conduct) to the base level offense. Sec. 1B1.2, Applicable Guidelines, instructs the court to apply the appropriate offense guideline found in Chapter Two and then determine the applicable guideline range pursuant to Sec. 1B1.3, Relevant Conduct.
 
 
 43
 Sec. 1B1.3, "Relevant Conduct (Factors that Determine the Guideline Range)," provides:
 
 
 44
 The conduct that is relevant to determining the applicable guideline range includes that set forth below.
 
 
 45
 (a)(1) all acts and omissions committed or aided and abetted by the defendant, or for which the defendant would be otherwise accountable, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense, or that otherwise were in furtherance of that offense;
 
 
 46
 (a)(3) all harm or risk of harm that resulted from the acts or omissions specified ... above, if the harm or risk was caused intentionally, recklessly or by criminal negligence, and all harm or risk that was the object of such acts or omissions;
 
 
 47
 (a)(5) any other information specified in the applicable guideline.
 
 
 48
 Id. (emphasis added). Furthermore, Application Note 3 to the Commentary following Sec. 1B1.3 defines "harm" to include "bodily injury, monetary loss, property damage and any resulting harm."
 
 
 49
 Under the scope of Sec. 1B1.3(a)(1), appellant's collision with Officer Lindeman's car occurred as appellant attempted to avoid responsibility for the bank robbery. The collision resulted in bodily injury to the officer and, therefore, merits a two-level increase pursuant to Sec. 2B3.1(b)(3)(A). Sec. 1B1.3(a)(3) indicates that recklessness or criminal negligence suffice, and that an intent to hit Officer Lindeman's car is not necessary. The district court, therefore, properly considered the harm that appellant inflicted upon Officer Lindeman and properly increased appellant's base level by two levels pursuant to Sec. 2B3.1(b)(3)(A).
 
 
 50
 Appellant also contests the two-level increase imposed by the district court for the properly loss pursuant to Sec. 2B3.1(b)(1)(C). "Loss" is generally defined in Application Note 2 following the Commentary to Sec. 2B1.1 as the "value of the property taken, damaged, or destroyed." The district court properly determined that the money paid by the city resulting from the automobile collision constituted damage to property caused by the appellant. Appellant was properly determined to fall within the $10,001-$50,000 range of Sec. 2B3.1(b)(1)(C), and, therefore, properly received a two-level increase to the offense level.
 
 
 51
 Furthermore, the district court could arguably have relied upon Sec. 1B1.4, "Information to be Used in Imposing Sentence (Selecting a Point Within the Guideline Range or Departing from the Guidelines)," which states that "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."
 
 
 52
 Appellant's final contention is that the prosecution failed to provide him notice that the monetary losses suffered by the city would be used to increase his sentence, thereby depriving him of due process. He asserts this same argument regarding his prior criminal history. Appellant fails to recognize that the appellee served notice on him of the government's intent in the "Objections of the United States to the Presentence Report." The appellant, therefore, had notice and this last assignment of error similarly fails.
 
 
 53
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 $2,017.00 to repair the police car appellant hit, $3,996.89 for medical expenses incurred by Officer Lindeman, and $5,819.19 for Officer Lindeman's lost wages, all paid by the City of Louisville