UNITED STATES of America, Appellee,

v.

Mark Stephen WALLRAFF, Appellant.

No. 82–1870.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 14, 1983.

Decided April 20, 1983.

Brian H. Miller, Miller & Boeder, Minneapolis, Minn., for appellant.

James M. Rosenbaum, U.S. Atty., John M. Lee, Asst. U.S. Atty., D. Minn., Minneapolis, Minn., Robert S. Soskin, Legal Intern, for appellee.

Before ROSS and FAGG, Circuit Judges, and SCHATZ,* District Judge.

SCHATZ, District Judge.

In this case we are called upon to assess the constitutionality of an airport stop and search initiated by Drug Enforcement Administration agents to apprehend a suspected narcotics courier. The matters presented herein require us to consider and determine "the delicate balance which must be struck between the interest of the public in terminating narcotics smuggling and the individual's right to live unburdened by unreasonable intrusions on his privacy ..." *United States v. Ramirez-Cifuentes,* 682 F.2d 337, 338 (2d Cir.1982).

The defendant-appellant, Mark Stephen Wallraff (defendant), was charged by indictment with possession with intent to distribute 2.2 pounds of cocaine, in violation of 21 U.S.C. § 841(a)(1). Prior to trial, the defendant filed a motion to suppress all evidence seized from his person and suitcase as well as certain statements he made to law enforcement officers. This motion to suppress was referred by the district court [1] to United States Magistrate Floyd E. Boline for hearing and the filing of a report and recommendation. A four-day suppression hearing was held before the magistrate, during which several witnesses testified to the events leading up to the detention of the defendant and his suitcase. After this plenary evidentiary hearing, the magistrate filed a comprehensive, well-reasoned report and recommendation of 37 pages, in which he made extensive findings of fact and recommended by way of conclusion that the defendant's motion to suppress be denied. Thereafter, on May 5, 1982, the district judge considered the timely objections of the defendant to the magistrate's report and recommendation, made a de novo determination adopting the factual findings and legal conclusions of the magistrate, and denied the motion to suppress. On the same date, the defendant waived his right to trial by jury and was convicted following a trial on stipulated facts. The district court subsequently sentenced the defendant to five years imprisonment and a special parole term of three years.

The defendant now appeals on the ground that the district court erred in not granting his motion to suppress evidence, and presents the following contentions for reversal: (1) that the detention of the defendant and his suitcase at the Minneapolis-St. Paul Airport amounted to an unreasonable search and seizure violative of the Fourth Amendment; (2) that the statements made by the defendant prior to his formal arrest were the result of a custodial interrogation and should be suppressed in light of the absence of timely *Miranda* warnings; and (3) that the affidavit accompanying the application for a warrant to search the defendant's bag was insufficient to establish probable cause, and contained intentional or recklessly made misstatements necessary to a finding of probable cause. We conclude that the trial court properly denied the suppression motion, and accordingly affirm the judgment of conviction of the defendant.

At the suppression hearing before the magistrate, the scenario of surveillance and the eventual encounter unfolded. The facts are these. On November 7, 1981, Sergeant David Knudson (sergeant Knudson) of the Minneapolis-St. Paul Airport Police Department was advised that Emery Air Freight had opened a parcel containing a substance suspected to be cocaine. This package, which proved to contain 26 grams of cocaine and six letters addressed to one Patty Blair, had been shipped from Longwood Development, 2331 Palmetto Drive, Longwood, Florida, to Mr. Terrance Anderson of Still-

---

* The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska, sitting by designation.

1. The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

water, Minnesota. On November 9, 1981, Drug Enforcement Administration Agent James Lewis (agent Lewis) of Minneapolis contacted Task Force Officer Edward Porro (officer Porro) of Orlando, Florida, to request assistance in conducting a follow-up investigation of the above-described drug shipment.

On November 12, 1981, officer Porro and another law enforcement agent located 2331 Palmetto Drive in an unincorporated portion of Seminole County, Florida. The officers knocked on the front door of the residence located at that address, but received no response. In the driveway of 2331 Palmetto Drive, the agents observed two vehicles: a brown Mercedes Benz bearing Florida license VRD 836; and a red Chevrolet Camaro with Florida license PHK 809. Upon radioing the Orlando Police Department for license verifications, officer Porro was advised that the Mercedes was registered to the defendant and the Camaro was registered to a Patty Blair.

Subsequently, law enforcement officers secured records reflecting long distance toll calls made between the Florida telephone number assigned to the defendant and the Minnesota telephone number assigned to Terrance Anderson. It was thereby determined that: (1) twelve calls had been made from the defendant's telephone to Terrance Anderson's telephone between August 1, 1981, and October 31, 1981; and (2) approximately 25 calls had been made from Terrance Anderson's telephone to the defendant's telephone between February 1, 1981, and October 31, 1981.

On January 8, 1982, Officer Porro and Task Force Officer Steven Collins (officer Collins) returned to 2331 Palmetto Drive. No one was found at home and no cars were parked in the driveway. Upon examination of the contents of two garbage cans which had been placed next to the curb in front of the residence, the officers discovered a prescription bottle with the name Patty Blair on it, an envelope addressed to Gregg and Patty Wallraff, and an envelope addressed to Gregg Wallraff.

After leaving the Palmetto Drive address, the officers proceeded to 1321 South Grant Street, which was listed as the defendant's address by the telephone company. There, after locating the defendant, the agents identified themselves as police officers and asked the defendant if they could speak with him. Defendant assented, but was visibly nervous and began to stutter. Officer Porro informed the defendant that he need not be alarmed, since the agents were not there to arrest or detain him. Initially, the defendant denied knowing anyone who lived on Palmetto Drive, but in response to further questioning: (1) the defendant said he knew a girl named Yvonne Miller who lived somewhere on Palmetto Drive; (2) the defendant admitted that his brother, Gregg Wallraff, and Patty Blair had lived at 2331 Palmetto Drive; (3) the defendant indicated that his brother and Patty Blair had separated, and his brother had moved to 521 Granada Way, an address adjacent to the defendant's Grant Street residence; and (4) the defendant stated that he had visited 2331 Palmetto Drive on occasion. During the course of this conversation, the defendant acknowledged that he was acquainted with Terrance Anderson, and stated that Anderson had done some woodcarving for his (defendant's) home. Defendant also expressed his willingness to meet with the Emery Air Freight driver who, on November 6, 1981, had picked up the cocaine-laden package from 2331 Palmetto Drive. Officer Porro subsequently attempted to locate Gregg Wallraff on four occasions, both at the Palmetto Drive residence and the Granada Way residence, but was unsuccessful. Prior to February 1, 1982, officer Porro transmitted to agent Lewis the result of the follow-up investigation by Florida agents of the November 6–7, 1981, cocaine shipment.

At approximately 2:30 p.m. on February 1, 1982, officer Collins recognized, and initiated direct surveillance of, the defendant in the Orlando airport. Officer Collins followed the defendant to a departure terminal where the defendant checked in as a passenger on Republic Airlines Flight 407 (Orlando to Minneapolis with an interim

stop in Memphis), which was late. Collins took a seat about twenty feet from the defendant in the departure gate area, whereupon: (1) the defendant looked at and appeared to recognize officer Collins as a result of their face-to-face meeting on January 8, 1982; (2) the defendant became extremely nervous; and (3) the defendant stood up and began to pace about the departure gate area. At some point, officer Collins was informed by a Republic Airlines ticket agent that the defendant was travelling under the name of "Mr. Willis" and had purchased a one-way ticket to Minneapolis with cash. Defendant subsequently walked to the Republic Airlines ticket counter, where he changed his reservation from Flight 407 to Flight 431, a direct flight from Orlando to Minneapolis scheduled to depart at 4 p.m. After checking with the ticket agent regarding the defendant's modified itinerary, officer Collins followed the defendant, who peered back over his shoulder at least once, to a second departure gate. Defendant sat down and stared intently at officer Collins. When Flight 431 started to board, the defendant moved ahead of some other passengers in the boarding line; while waiting to enter the jetway, the defendant raised up on his toes four or five times and looked back as if trying to detect whether he was being followed. Shortly after the boarding process was completed, officer Collins telephoned agent Lewis in Minneapolis and summarized his observations regarding the defendant's conduct in the Orlando airport.

About 6:15 p.m. on February 1, 1982, agent Lewis, Drug Enforcement Administration Agent Jerry Kramer (agent Kramer), Minnesota Bureau of Criminal Apprehension Agent Olby (agent Olby), and sergeant Knudson observed the defendant disembark at Gate 68 of the Minneapolis-St. Paul airport. As the defendant entered the building and proceeded toward the main terminal, agent Lewis observed the defendant looking to his rear as if he were in fear of being followed. Agent Olby, but not agent Lewis, saw the defendant trembling and continually glancing from side to side. Defendant then walked quickly to Republic

Airlines baggage claim area 14 and watched all the luggage from Flight 431 being unloaded, but made no attempt to claim or pick up his own suitcase, a brown bag with numerous travel stickers affixed to one side but bearing no identification tag. This suitcase and the travel stickers appeared to be in excellent condition considering the extensive amount of travel indicated by the stickers. By about 6:45 p.m., the suitcase, which was the only piece of luggage not claimed by passengers from Flight 431, was removed from the carousel by an airline employee and placed against the rear wall of the baggage claim area. After making a telephone call, the defendant proceeded to a bar located in the main airport terminal, where he met William F. Engwer and consumed four or five drinks during the course of the next two hours.

At approximately 8:30 p.m., the defendant returned to baggage claim area 14 and walked toward the wall behind the carousel. After visually inspecting the brown bag with no identification tag and surveying the people in the immediate area, the defendant walked about one hundred feet down the concourse, stopped near a different carousel area, turned around, and carefully scanned bag claim area 14 for more than two minutes in a manner which to the agents suggested that the defendant was trying to detect surveillance. Defendant then walked back into baggage claim area 14, picked up the suitcase and proceeded rapidly toward the nearest exit.

As the defendant neared the door leading out of the terminal to the street, agents Lewis and Kramer approached him, displayed their badges with their left hands, identified themselves as law enforcement officers, and asked the defendant if he would mind talking with them for a moment, to which the defendant replied, "Sure." The weight of the evidence suggests that the weapons carried by the agents were concealed from the view of the defendant. When agent Lewis asked to see the defendant's airline ticket, the defendant handed over his ticket folder to Lewis. The ticket was issued in the name of Mr. Willis,

had been purchased on February 1, 1982, and paid for in cash, and listed a one-way flight from Orlando to Minneapolis with a stopover in Memphis. Attached to the ticket envelope was a baggage claim check bearing the same number as the claim check attached to the brown suitcase carried by defendant. Upon handing his ticket envelope to agent Lewis, the defendant denied having flown from Florida to Minneapolis, and said that he had come up from Memphis that day. Defendant subsequently acknowledged that the brown bag was his, and asked the agents what was going on. Agent Lewis responded that the agents were conducting a narcotics investigation. Defendant, whose face was flushed and who appeared to be perspiring heavily, stated that he had no identification other than his airline ticket. In response to a further question from agent Kramer regarding his identity, the defendant said that his full name was Michael Stephen Willis, his date of birth was November 10, 1954, and his social security number was 470–62–1483. Agent Lewis then asked the defendant if he would permit the agents to examine the contents of his suitcase, advising the defendant that he could refuse to give his consent if he wished and that the agents did not have a search warrant. Defendant replied that he did not want the agents to look in the suitcase and told them to get a search warrant. Agent Lewis told the defendant that: (1) he (Lewis) felt there existed reasonable suspicion to believe that illegal drugs were present in the defendant's bag; (2) the agents were going to detain the defendant's airline ticket envelope and suitcase but defendant himself was free to go; and (3) the agents would be applying for a search warrant. The defendant was further informed that, if he wished to accompany the agents to the Airport Police Department Office (police office), they would give the defendant a receipt for the items seized and prepare a computer run on driver's license information which he could use for identification purposes.

The entire conversation between the agents and the defendant, near the terminal exit, lasted approximately two minutes.

During this encounter, the defendant became increasingly apprehensive but was not physically restrained by agent Lewis or agent Kramer, nor did the defendant express any desire to leave.

Apparently desiring the receipt, the defendant followed the agents to the police office and sat in the lobby while agent Lewis prepared a receipt for the suitcase and ticket envelope in the name of Michael Stephen Willis. The police office is approximately one hundred feet from where agents Lewis and Kramer initially stopped the defendant. The airport police dispatcher ran a computer check with regard to the existence of any driver's licenses issued by the States of Minnesota or Florida in the name of Michael Stephen Willis. By 8:39 p.m., the computer printout response to said license verifications was received and showed an absence of driver's license records for Michael Willis in either Minnesota or Florida. In response to questions by agent Kramer, the defendant denied knowing anyone at the airport and indicated his intention to take a taxicab to his destination in St. Paul. Thereupon, after confirming by way of personal observation and computer verification that defendant had provided false information with respect to his identity, travel schedule and residence, agent Lewis addressed the defendant as "Wallraff," to which defendant responded, "I don't know what you are talking about." At this point, between 8:40 p.m. and 8:45 p.m., agent Lewis placed the defendant under formal arrest. Defendant was searched for weapons and was advised of his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). When questioned, the defendant stated that he understood his rights and did not wish to waive them. Not more than fifteen minutes elapsed between the agents' initial contact with the defendant near the terminal exit and the defendant's arrest in the airport security office.

At approximately 3 a.m., the agents completed preparation of an affidavit to support their application for a warrant authorizing a search of the defendant's suitcase.

An appropriate search warrant was subsequently issued, and the ensuing examination of the defendant's bag revealed that it contained 2.2 pounds of 97 per cent pure cocaine.[2]

## Standard of Review

 The settled rule in this circuit "is that a district court's determinations, made in the context of a motion to suppress, as to the validity of a warrant or the existence of circumstances justifying a warrantless arrest are to be reviewed under the 'clearly erroneous' standard." *United States v. McGlynn,* 671 F.2d 1140, 1143 (8th Cir.1982); *accord, United States v. Torgersen,* 690 F.2d 682, 683 (8th Cir.1982); *United States v. Wentz,* 686 F.2d 653, 656 (8th Cir.1982). Under that standard, this court will ordinarily affirm the trial court's decision unless it is not supported by substantial evidence, it evolves from an erroneous conception of the applicable law, or we are left with a firm conviction that a mistake has been made after having considered the entire record. *United States v. McGlynn, supra.* Our standard of review requires that particular deference be given to the fact finder, who had the opportunity to observe the testimony and demeanor of both the law enforcement officers and the defendant. *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982); *United States v. Patino,* 649 F.2d 724, 728 (9th Cir.1981).

## Seizure of the Defendant and His Suitcase

Simply stated, the primary issue raised on appeal is whether the seizure and subsequent search of the defendant and his suitcase on February 1, 1982, satisfies the Fourth Amendment's test of reasonableness. *See United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 95 S.Ct. 2574, 2578–79, 45 L.Ed.2d 607 (1975). In this regard, the magistrate made the following findings and conclusions: (1) that the initial stop of the defendant by agents Lewis and Kramer was an investigatory stop based upon collective information "sufficient to justify a reasonable suspicion of criminal activity which warranted further investigation," *United States v. Deggendorf,* 626 F.2d 47, 52 (8th Cir.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980); (2) that the temporary detention of the defendant's suitcase prior to his arrest was minimally intrusive (10 to 15 minutes in duration) and was premised upon articulable facts generating a reasonable suspicion that the bag contained narcotics; (3) that the arrest of defendant occurred in the airport police office and was supported by probable cause; and (4) that the items seized from the defendant's person were validly seized pursuant to a search made incident to a lawful arrest. Discussion of these findings viewed in light of the defendant's arguments on appeal follows.

---

**2.** At the suppression hearing before the United States Magistrate, the defendant presented a different version of the facts surrounding his detention by agents Lewis and Kramer. Under *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we are compelled to view the facts in the light most favorable to the government and we have done so. Nevertheless, the defendant's recitation will be recounted briefly.

Defendant claims that, when agents Lewis and Kramer approached him, Lewis grabbed the defendant's right hand, in which he was carrying the brown suitcase. Defendant said that he saw a nickel-plated handgun, partially concealed by a jacket, on agent Kramer's right hip. According to the defendant, agent Lewis stated that no one was permitted to leave the area without showing a baggage claim check, and asked the defendant for such a claim check. Defendant then opened his jacket, whereupon agent Lewis reached in and physically removed the defendant's ticket envelope from his jacket pocket. Defendant asserts that, after the agents seized his suitcase, they told the defendant he would have to accompany them to the airport police office if he wished to be provided with a receipt for his suitcase. Once inside the police office, the defendant claims that agent Lewis positioned himself between the defendant and the door, and that agent Kramer said something about the defendant being a vagrant. Defendant also asserts that a police back-up unit had been stationed outside the exit in order to intercept and apprehend the defendant in case he attempted to escape.

The magistrate acknowledged the discrepancies in the factual recitations as presented by the respective parties, stating: "I have considered the testimony of the defendant and that of the officers; I find the testimony of the officers to be credible and I find the defendant's testimony not to be credible."

■ It may be noted that Supreme Court decisions sculpt out, at least theoretically, three tiers or categories of police-citizen encounters: communication between law enforcement officers and citizens involving no coercion or restraint of liberty and therefore outside the compass of the Fourth Amendment; brief, minimally intrusive "seizures" that must be supported by a reasonable suspicion of criminal activity; and highly intrusive, full-scale arrests, which must be based upon probable cause. *United States v. Black, supra,* 675 F.2d at 133; *United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982) (en banc). The controlling principle with regard to an investigative stop, which is considered a seizure sufficient to invoke Fourth Amendment safeguards, is that such a stop "must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980); *accord, United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2640–41, 61 L.Ed.2d 357 (1979); *United States v. Brignoni-Ponce, supra,* 422 U.S. at 882–84, 95 S.Ct. at 2580–82; *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *United States v. Deggendorf, supra.* To be reasonable, the suspicion must be more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio, supra,* 392 U.S. at 27, 88 S.Ct. at 1883, and must be derived from an assessment of the whole picture available to the detaining officers, *United States v. Cortez, supra,* 449 U.S. at 417–18, 101 S.Ct. at 694–95. We rely on the teachings of *Terry* and its progeny in evaluating whether, at the moment of the initial encounter between the police officer and the suspected narcotics courier, on the basis of objective and particularized facts and the rational inferences to be drawn therefrom, the intrusion was necessary and was based upon a reasonable suspicion. *See United States v. Ramirez-Cifuentes, supra,* 682 F.2d at 341; *see also United States v. Gooding,* 695 F.2d 78, 82 (4th Cir.1982).

■ We are further guided in our analysis by certain established principles. First, in determining whether the requisite degree of suspicion existed, the observations of the involved law enforcement agents must be viewed as a whole, not as discrete and disconnected occurrences. *United States v. Ramirez-Cifuentes, supra,* 682 F.2d at 342; *see United States v. Cortez, supra,* 449 U.S. at 419, 101 S.Ct. at 695–96. Second, such observations must be viewed through the eyes of persons who, like the agents responsible for the surveillance and detention of the defendant in this case, are "trained and experienced in discerning in ostensibly innocuous behavior the indicia of narcotics trafficking." *United States v. Forero-Rincon,* 626 F.2d 218, 222 (2d Cir.1980). Thus, "conduct which would be wholly innocent to the untrained observer," *United States v. Mendenhall,* 446 U.S. 544, 563, 100 S.Ct. 1870, 1882, 64 L.Ed.2d 497 (1980), *quoting Brown v. Texas, supra,* 443 U.S. at 52 n. 2, 99 S.Ct. at 2641, might acquire significance when viewed by an agent who is familiar with the practices of drug smugglers and the methods used to avoid detection. *United States v. Forero-Rincon, supra; see United States v. McGlynn, supra,* 671 F.2d at 1144. Third, although the conduct in question may be as consistent with innocence as with guilt, it might still indicate possible illicit activity and form the foundation for a valid investigatory stop. *United States v. Ramirez-Cifuentes, supra.* As another court confronted with a similar situation has noted, "[i]t must be rare indeed that an officer observes behavior consistent only with guilt and incapable of innocent interpretation." *United States v. Black, supra,* 675 F.2d at 137, *quoting United States v. Price,* 599 F.2d 494, 502 (2d Cir.1979); *accord, United States v. Viegas,* 639 F.2d 42, 45 (1st Cir.), *cert. denied,* 451 U.S. 970, 101 S.Ct. 2046, 68 L.Ed.2d 348 (1981).

Here, viewing the facts as a whole, together with the rational inferences to be drawn from them, we agree with the district court that the suspicions of agents Lewis and Kramer were reasonable and the initial investigative stop of the defendant

was fully justified. It is not inappropriate to note that the defendant had been under investigation since approximately November 12, 1981, and was under close observation by police officers both in Florida and Minneapolis-St. Paul on February 1, 1982. At the time that agents Lewis and Kramer approached the defendant in the airport terminal and presented their credentials, the following factors were established:

1) The agents were in possession of information circumstantially linking the defendant with the November 6–7, 1981, shipment of cocaine from Longwood, Florida, to Terrance Anderson in Stillwater, Minnesota.

2) The agents had received verbal information from officer Collins detailing the defendant's false identity and nervous pattern of behavior in the Orlando airport.

3) The agents personally observed the defendant's nervous demeanor and furtive conduct in the Minneapolis-St. Paul airport, as described in the factual narrative presented earlier in this opinion.

These factors, taken as a whole, and given the familiarity of agents Lewis and Kramer with the practices of narcotics couriers, provided the agents with objectively reasonable suspicion to conduct an investigatory stop and to further interrogate the defendant.[3] *See United States v. Ehlebracht,* 693 F.2d 333, 337 (5th Cir.1982); *United States v. Regan,* 687 F.2d 531, 536 (1st Cir.1982).

 Similarly, we conclude that the detention of the defendant's suitcase prior to his arrest in the police office was a minor intrusion and did not amount to an unreasonable seizure of his property in violation of the Fourth Amendment. Reasonable

suspicion forms a sufficient ground for law enforcement officers to temporarily detain an airport traveller's luggage pending investigation. *United States v. Regan, supra; United States v. Viegas, supra; United States v. Klein,* 626 F.2d 22, 26 (7th Cir. 1980); *see United States v. Swayne,* 700 F.2d 467, 469 n. 2 (8th Cir.1983) (citing the standards enunciated in *Viegas* with apparent approval). The information garnered by agents Lewis and Kramer as well as their observations of the defendant's behavior satisfied this test. As correctly found by the magistrate, the defendant's bag was held pursuant to a *Terry*-style investigative stop based on reasonable suspicion for a period not in excess of fifteen minutes. Thereafter, when provided with the additional facts gained in the police office, the agents had probable cause for the arrest of the defendant and the continued seizure of his suitcase.[4] *Cf. United States v. Regan, supra,* 687 F.2d at 537–38 (22-hour detention of suspect's bag on evidence "below the threshold of probable cause" violated the Fourth Amendment).

Having determined that agents Lewis and Kramer had a reasonable suspicion based on specific facts that the defendant was involved in criminal activity, we now turn to the question of whether the defendant validly consented to travel to the police office. This issue arose on analogous facts in *United States v. Mendenhall, supra,* and *United States v. Deggendorf, supra.* Looking at the totality of all the circumstances, a majority of the Supreme Court (*Mendenhall*) and this court (*Deggendorf*) concluded the evidence adequately supported the trial court's finding that the suspect in

---

**3.** While agreeing that the stop in the instant case was grounded in articulable facts and was minimally intrusive, the government invites us to rule that the initial contact between agent Lewis and the defendant was not a seizure within the meaning of the Fourth Amendment. *See United States v. Mendenhall, supra,* 446 U.S. at 551–55, 100 S.Ct. at 1875–78 (plurality opinion of Stewart, J.). We decline the invitation. Since the stop was clearly justified by an application of the established principles of reasonable suspicion and minimal intrusion, we see no need to reach beyond them in the cir-

cumstances here presented. Stated simply, "no purpose would be served by marking boundaries where none need to be inscribed." *United States v. Ramirez-Cifuentes, supra,* 682 F.2d at 344 n. 6.

**4.** In passing, we reject and find no need to discuss the emphasis placed by the defendant on the role of drug detecting dogs in establishing the probable cause that might well otherwise exist. *See United States v. Jodoin,* 672 F.2d 232, 236 (1st Cir.1982).

question voluntarily consented to accompany the detaining agents to an airport police facility. *United States v. Mendenhall, supra,* 446 U.S. at 557–58, 100 S.Ct. at 1878–79; *United States v. Deggendorf, supra,* 626 F.2d at 52–53. In *Deggendorf,* this court's implicit determination that a seizure, *i.e.,* investigatory stop, had occurred, did not affect its finding that the suspect voluntarily consented to go with DEA agents to the police room at the St. Louis airport. *See also United States v. Berry, supra,* 670 F.2d at 606–07 (special concurrence of Anderson, J.).

 We apply a similar analysis to the facts underlying the instant appeal. As in *Deggendorf,* the defendant was not told or commanded to go to the police office. Agent Lewis stated that (1) although his suitcase and airline ticket folder were being detained, the defendant himself was free to leave; and (2) the defendant would be given a receipt for the items seized if he would accompany the agents to the police office. The defendant then followed the agents to the office and sat in the lobby. There is no credible evidence of coercion or that the agents attempted to intimidate the defendant into accompanying them to the police office. *See United States v. Mendenhall, supra,* 446 U.S. at 558, 100 S.Ct. at 1879; *United States v. Ehlebracht, supra,* 693 F.2d at 338. A crucial fact here is that, prior to being asked to walk to the office if he desired a receipt, the defendant declined to consent to a search of his suitcase and told the agents to get a warrant. "This indicates that he understood that he had the right to refuse to cooperate with [Lewis and Kramer]." *United States v. Ehlebracht, supra.* Under these circumstances, we find that agent Lewis' possession of the airline ticket folder had no significant coercive effect on the defendant's decision to proceed to the police office. *See United States v. Ehlebracht, supra.* Since the defendant voluntarily consented to accompany agents Lewis and Kramer to the police office, the defendant was not under arrest at that point and no constitutional violation tainted the information which he supplied to the agents prior to arrival at said office. *Unit-*

*ed States v. Deggendorf, supra,* 626 F.2d at 53.

 The magistrate's findings that (1) the defendant was arrested when agent Lewis so informed him in the police office, and (2) the agents had probable cause to arrest the defendant without a warrant, must be upheld unless clearly erroneous. *United States v. Wentz, supra; United States v. McGlynn, supra,* 671 F.2d at 1143. In determining whether probable cause exists to make a warrantless arrest, a court will consider whether the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed or was committing an offense. *United States v. Swayne, supra,* at 469; *United States v. Slupe,* 692 F.2d 1183, 1188 (8th Cir.1982); *United States v. Miller,* 608 F.2d 289, 291 (8th Cir.1979). Probable cause is to be assessed in terms of the circumstances confronting a reasonably cautious police officer at the time of the arrest, and the arresting officer is entitled to consider the circumstances, including arguably innocent conduct, in light of his training and experience. *United States v. Wentz, supra,* 686 F.2d at 656 & n. 3; *United States v. McGlynn, supra,* 671 F.2d at 1143–44. "[T]he probability, and not a prima facie showing, of criminal activity, is the standard of probable cause." *Spinelli v. United States,* 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969).

The contention of the defendant herein that his arrest was not supported by probable cause under federal standards "ignores the facts known to the arresting officers from trustworthy information and their observations that night." *United States v. Slupe, supra.* As previously noted, agents Lewis and Kramer had received from officer Collins specific information regarding the defendant's assumed identity and suspicious behavior in the Orlando airport, and had observed the defendant's heightened nervousness and furtive actions in the Minneapolis air terminal. Upon arrival in the police office: (1) the defendant denied

knowing anyone at the airport, notwithstanding his privity with William Engwer in the terminal bar; (2) the falsity of the defendant's alias was confirmed by the computer printout showing that neither Minnesota nor Florida had issued a driver's license in the name of "Michael Stephen Willis;" and (3) the defendant said, "I don't know what you are talking about" when addressed by his correct surname. When the defendant's direct lies are taken together with the series of events observed by the agents and the other trustworthy information in their possession, we agree with the district court that facts sufficient to show probable cause had been established and the arrest of the defendant in the airport police office was valid for this reason. *See United States v. Ehlebracht, supra; United States v. Slupe, supra; United States v. Jodoin, supra,* 672 F.2d at 235; *United States v. McGlynn, supra,* 671 F.2d at 1144.

▆ Since the arrest of the defendant was lawful, a search incident to his arrest was likewise valid. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court stated:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a "reasonable" search under that Amendment.

414 U.S. at 235, 94 S.Ct. at 477.

The reasoning in *Robinson* is applicable to the circumstances of the instant case, and we hold that the seizure of evidence from the defendant's person "was constitutionally permissible." *United States v. McGlynn, supra; see United States v. Wentz, supra,* 686 F.2d at 656.

Admissibility of Pre-Arrest Statements

The defendant's next argument is based on alleged violation of his Fifth Amendment rights. The defendant contends that certain statements he made prior to being formally arrested were elicited without the necessary *Miranda* warnings, and that their admission at trial was violative of his right against self-incrimination. We do not agree.

▆ The warnings required by the *Miranda* decision must be given only when there is a custodial interrogation. *Miranda v. Arizona, supra,* 384 U.S. at 444, 86 S.Ct. at 1612; *United States v. Phillips,* 688 F.2d 52, 55 (8th Cir.1982); *United States v. Grady,* 665 F.2d 831, 833 (8th Cir.1981); *United States v. Jones,* 630 F.2d 613, 615 (8th Cir. 1980). Such interrogation may be defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona, supra.* It is appropriate to reiterate that simply identifying the place where an interrogation occurs does not conclusively establish the presence or absence of custody. *United States v. Jones, supra.* Similarly, the fact that the investigation has proceeded to a point in time at which it may be said to have focused on the defendant is insufficient to render an interrogation custodial, *id.,* and "does not weigh heavily in that analysis," *United States v. Jimenez,* 602 F.2d 139, 145 (7th Cir.1979). Other factors, such as the presence or absence of a formal arrest and any evidence of strong arm tactics, while not determinative, are of course relevant in deciding whether "there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714 (1977); *see United States v. Phillips, supra;*

*United States v. Jones, supra,* 630 F.2d at 616; *United States v. Jimenez, supra,* 602 F.2d at 143–44. As this court recognized in *United States v. Grady, supra,* the overriding concern of *Miranda* was the need for special safeguards in the case of an

incommunicado interrogation of individuals in a police-dominated atmosphere resulting in self-incriminating statements without full warnings of constitutional rights.

384 U.S. at 445, 86 S.Ct. at 1612.

■ In the case at bar, the questioning of the defendant near the airport terminal exit and in the police office was clearly an interrogation. *See Rhode Island v. Innis,* 446 U.S. 291, 300–02, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). The critical question, therefore, is whether the interrogation occurred in a custodial setting. As we have already found: (1) agent Lewis told the defendant he was free to leave although his bag and ticket folder were being detained; (2) the defendant voluntarily accompanied the agents to the police office; (3) neither agent Lewis nor agent Kramer displayed a weapon or threatened the defendant; (4) by reason of his refusal to consent to an examination of his suitcase, the defendant realized that he had the right not to cooperate with the agents; and (5) the defendant was not under arrest at the time the questions regarding his identity and travel schedule were propounded to him. Additionally, most of the questioning of the defendant by agents Lewis and Kramer took place near the terminal exit, which is hardly the type of "police-dominated" surrounding that concerned the *Miranda* Court. *See United States v. Grady, supra.* The record discloses no credible evidence that the conduct of the agents or the coercive aspects of the interrogation were such as to overbear the free will of the defendant and cause his statements to be involuntary. *United States v. Jones, supra; see United States v. Larson,* 612 F.2d 1301, 1304 (8th Cir.), *cert. denied,* 446 U.S. 936, 100 S.Ct. 2154, 64 L.Ed.2d 789 (1980); *Iverson v. North Dakota,* 480 F.2d 414, 424 (8th Cir.), *cert. denied,* 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335 (1973). Until placed under arrest in the police office, the defendant "was free to depart, [and] to refuse to answer questions." *United States v. Phillips, supra.* In sum, the record is devoid of evidence which would reasonably lead to the conclusion that the defendant was in custody. *See United States v. Jones, supra.*

Considering all the circumstances surrounding the agents' questioning of the defendant in this case, including close scrutiny of the brief interrogation in the airport police office, we are of the opinion that *Miranda* warnings were not required. *See United States v. Jimenez, supra,* 602 F.2d at 146. Accordingly, the defendant's pre-arrest statements were properly admitted at trial. *United States v. Phillips, supra; see Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976).

Sufficiency of Warrant Affidavit

The defendant's final argument on appeal is that the warrant authorizing a search of his suitcase was defective and that all fruits of that search should, therefore, have been suppressed. This contention is based upon the defendant's claim that the seven-page affidavit filed by sergeant Knudson in support of an application for a warrant to search the defendant's bag for controlled substances was insufficient to establish probable cause.

Recently, this court has been presented with several opportunities to review and apply the principles used in determining the sufficiency of an affidavit for a search warrant. *E.g., United States v. Wentz, supra,* 686 F.2d at 657–58; *United States v. Leichtling,* 684 F.2d 553, 555–56 (8th Cir.1982); *United States v. Sumpter,* 669 F.2d 1215, 1218–22 (8th Cir.1982); *United States v. Button,* 653 F.2d 319 (8th Cir.1981); *United States v. Deggendorf, supra,* 626 F.2d at 51–53. It may be noted: that "[c]ourts evince a strong preference for searches made pursuant to warrant," *United States v. Brown,* 584 F.2d 252, 256 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1220, 59 L.Ed.2d 458 (1979); that "reviewing courts should interpret affidavits for search warrants in a commonsense and realistic fash-

ion," *United States v. Leichtling, supra,* 684 F.2d at 555; and that "an issuing judge's determination of probable cause is entitled to great deference," *United States v. Wentz, supra.*

■ Both the federal magistrate and the district court judge believed that the affidavit here, considered in its entirety and read in a commonsense manner, made out probable cause for the search of the defendant's bag. *See Spinelli v. United States, supra,* 393 U.S. at 415, 89 S.Ct. at 588–89, and *United States v. Ventresca,* 380 U.S. 102, 108–09, 85 S.Ct. 741, 745–46, 13 L.Ed.2d 684 (1965). And so do we. *See United States v. Jodoin, supra.* The detailed recitation of observations and information obtained by law enforcement officers pursuant to the surveillance, investigation and arrest of the defendant, clearly provides an adequate showing of probable cause to believe that the defendant was engaged in drug related activity at the time the application for a warrant was drafted. *See United States v. Wentz, supra,* 686 F.2d at 658; *United States v. Sumpter, supra,* 669 F.2d at 1219 n. 5, 1222. We hold, therefore, that the search warrant in this case was validly issued.[5] *See United States v. Slupe, supra; United States v. Leichtling, supra,* 684 F.2d at 556; *United States v. McGlynn, supra,* 671 F.2d at 1146; *United States v. Deggendorf, supra,* 626 F.2d at 53.

5. With regard to the defendant's challenge to the veracity and materiality of certain factual allegations appearing in or omitted from the warrant affidavit, we are of the opinion that the magistrate did not clearly err in finding that the defendant utterly failed to meet the burden articulated by this court in *United States v. House,* 604 F.2d 1135 (8th Cir.1979), *cert. denied,* 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980):

> The search warrant is invalid and the fruits of the search excluded only if the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence and, with the affidavit's false material set to one side, the affidavit's remaining material is insufficient to establish probable cause.

604 F.2d at 1139; *see Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978).

6. Our conclusion is unaffected by the Supreme Court's recent decision in the factually distinguishable case of *Florida v. Royer,* —— U.S.

Conclusion

For each and all of the foregoing reasons, and after a thorough review of the entire record in this case, we conclude that the judgment of the district court should be and is hereby affirmed.[6]

——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where a consent to search was held invalid because tainted by an involuntary detention which exceeded the limits of a *Terry* investigative stop and was not supported by probable cause. Unlike the situation presented in *Royer,* here: (1) the detention of the defendant was based upon information independent of, and more substantial than, the identification of characteristics thought to be within the drug courier profile; (2) prior to the walk from the terminal exit to the police office, agent Lewis told the defendant he was free to depart; (3) the defendant understood that he had the right to refuse to cooperate with the detaining agents; (4) agents Lewis and Kramer did not take any identification from the defendant; and (5) since his airline ticket listed a one-way flight, the defendant was not deprived of his means of transportation upon handing his ticket envelope to agent Lewis.