_____

No. 95-1785
_____

Edward Brodnicki,                        *
                                         *
          Appellant,                     *
                                         *
     v.                                  *
                                         *
City of Omaha, Nebraska, a               *   Appeal from the United States
Municipal Corporation; County            *   District Court for the
of Douglas, a Nebraska                   *   District of Nebraska.
Political Subdivision;                   *
Patrick A. McCaslin; Kevin               *
Donlan; Jeffery J. Theulen;              *
John Skanes; Michael Hoch;               *
James Jansen; John Swanson,              *
                                         *
          Appellees.                     *


_____

          Submitted:  October 18, 1995

              Filed:  January 31, 1996
_____

Before BOWMAN, FLOYD R. GIBSON, and WOLLMAN, Circuit Judges.

_____

BOWMAN, Circuit Judge.


     Edward Brodnicki appeals the adverse grant of summary judgment
by the District Court[1] in Brodnicki's 42 U.S.C. § 1983 action
against the City of Omaha, Douglas County, members of the Omaha
Police Department, and the county attorney, James Jansen.  We
affirm.

_____

     [1]The Honorable Lyle E. Strom, United States District Judge for
the District of Nebraska.

This case began when a nine-year-old girl, Meaghan Callaghan, reported to Omaha police that she had been approached and followed by a man who tried to coax her into his car. She stated that the man had dirty-blonde hair, a moustache, wore sunglasses, a black hat and black shirt, and drove a white car with license plate number 1-AA864. Callaghan reported that the man opened his car door and said, "Your mother's going to be late at work, and she told me to pick you up." Callaghan stated that although she refused to get into the car with the man, he continued to follow her for two blocks, repeating his request for her to accompany him. The police traced the license plate number to Brodnicki's car.

Police brought Callaghan and her father to Brodnicki's home, where she identified Brodnicki's car as the one that followed her. After obtaining Brodnicki's consent, police arranged for a "showup,"[2] with Brodnicki standing in his front yard so that Callaghan could observe him from the police cruiser. The officers cautioned Callaghan about the serious nature of her allegations and the importance of accuracy. Callaghan positively identified Brodnicki as the driver of the car that had followed her.

Next, the officers obtained Brodnicki's consent to search his car where they found sunglasses, a baseball cap similar to the one described by Callaghan, and a stocking cap. Subsequently, Brodnicki was taken to police headquarters for questioning. He explained that he was at home alone on the afternoon in question; he did not provide the name of any person who could verify his whereabouts. He was given an opportunity to confront Callaghan, but he declined. The officers concluded there was sufficient

---

[2]A "showup" is a procedure where a single individual is exhibited to a witness and the witness is asked whether she can identify the individual as the perpetrator of the crime being investigated.

evidence to arrest Brodnicki and to charge him with attempted kidnapping. A preliminary hearing was held in which Brodnicki cross-examined the state's witnesses, and he was provided the opportunity to present evidence, but he declined. Brodnicki was bound over for trial and released on bond. Soon thereafter, Brodnicki hired his own investigators, who concluded that he was at home during the alleged incident and did not drive his car during the relevant time period. The investigators also interviewed children with whom Callaghan had played on the day of the alleged incident. One child stated that she followed Callaghan home, but never saw Brodnicki approach Callaghan. After confirming this information, the county attorney's office dismissed the charges against Brodnicki.

Brodnicki then brought this § 1983 action, claiming that he was arrested without probable cause and that the arrest was pursuant to a policy or practice of the City of Omaha. Brodnicki also claimed that Jansen violated his due process rights by prosecuting him for attempted kidnapping and that Jansen's actions were taken pursuant to the policies and practices of Douglas County. Defendants Jansen and Douglas County moved for summary judgment arguing, inter alia, that Jansen, as county attorney, was entitled to absolute immunity for his actions in connection with the charges against Brodnicki and that Jansen's conduct was not pursuant to policies and practices approved by Douglas County. The District Court granted summary judgment to Jansen and Douglas County, concluding that Jansen was entitled to absolute immunity and that there was no basis for finding Douglas County liable. The police officers also filed a motion for summary judgment, claiming that they were entitled to qualified immunity. Before the District Court ruled on that motion, the officers and the City moved for summary judgment on the merits. The District Court did not address the officers' qualified immunity defense, but instead granted summary judgment on the merits in favor of the officers and the City. The District Court held that the officers had probable cause

to arrest Brodnicki, and, since the officers' actions were proper, there was no basis for holding the City liable under a theory of inadequate training or municipal custom.

Brodnicki timely appeals.[3] He argues that as a matter of law (1) the police officers violated his Fourth Amendment rights by arresting him without probable cause; (2) the officers acted pursuant to policies and practices approved by the City of Omaha; and (3) Jansen violated Brodnicki's due process rights by prosecuting him for attempted kidnapping.[4]

**I.**

We review de novo the decision to grant a summary judgment motion. Maitland v. University of Minn., 43 F.3d 357, 360 (8th Cir. 1994). We will affirm the judgment if the record shows that there is no genuine issue of material fact and that the prevailing party is entitled to judgment as a matter of law. Id.; see also Fed. R. Civ. P. 56(c).

**II.**

Brodnicki argues that the facts, as to which there are no material disputes, show that the Omaha police officers did not have probable cause for his arrest, which therefore violated his rights under the Fourth Amendment made applicable to the states through the Fourteenth Amendment's Due Process clause. See Baker v. McCollan, 443 U.S. 137, 142 (1979); Hannah v. City of Overland, 795 F.2d 1385, 1389 (8th Cir. 1986) (holding § 1983 action lies for

_____

[3]On June 8, 1995, Brodnicki filed a motion to supplement the record. His motion was ordered taken with the case. Brodnicki's motion to supplement the record is granted.

[4]Because Brodnicki does not challenge the District Court's decision granting summary judgment in favor of Douglas County, that ruling is not before us.

warrantless arrest without probable cause).  Probable cause exists if "the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense" at the time of the arrest.  Hannah, 795 F.2d at 1389 (quoting United States v. Wallraff, 705 F.2d 980, 990 (8th Cir. 1983).  "[T]he probability, and not a prima facie showing, of criminal activity is the standard of probable cause."  Id. (quoting Wallraff, 705 F.2d at 990) (internal quotations omitted)).

Brodnicki makes several arguments as to why, in his view, his arrest lacked probable cause.  First, he argues that the police were not justified in believing Callaghan's story when confronted with his denial of the alleged incident, and that the police had a duty to investigate his alibi before making their probable cause determination.  We disagree.  The officers were not required to conduct a mini-trial before arresting Brodnicki.  Morrison v. United States, 491 F.2d 344, 346 (8th Cir. 1974).  Probable cause is to be determined upon the objective facts available to the officers at the time of the arrest.  Id.  Moreover, the officers' reliance on Callaghan's story of her near-abduction was not objectively unreasonable.  Callaghan appeared to be a credible witness.  She gave the police a specific description of the car, its license plate number, and a detailed account of the incident. This information led the police to identify Brodnicki's car, which matched Callaghan's description.  Brodnicki's car then was found in the immediate vicinity where, according to Callaghan, she was accosted while on her way home after playing with her friends. Callaghan's mother made statements to the officers attesting to her daughter's truthfulness.  Callaghan identified Brodnicki in a showup.  Upon this evidence, a reasonable police officer could conclude that probable cause existed to arrest Brodnicki.

Brodnicki correctly asserts that his physical appearance is somewhat inconsistent with Callaghan's description of the man who

-5-

allegedly attempted to lure her into his car. For example, Brodnicki is six feet two inches tall and 280 pounds with dark brown hair as opposed to five feet eleven inches tall and 220 pounds with dirty-blonde hair; Brodnicki has a beard but no mustache; he was dressed in a brown shirt rather than a black shirt. Brodnicki argues that such inconsistencies vitiate probable cause. We disagree. The evaluation of evidence to determine if probable cause exists is not an exact science. Brinegar v. United States, 338 U.S. 160, 175-76 (1949) (defining probable cause as a practical, nontechnical concept that strikes a balance between society's interest in effective law enforcement and protection of law-abiding citizens). We must consider the inconsistencies that Brodnicki points out in light of all of the circumstances of which the arresting officers were aware at the time of his arrest, including Callaghan's tender age. Having done so, we conclude that these inconsistencies are not sufficient to defeat a finding of probable cause.

Brodnicki next argues that the showup at his house was so suggestive that it was improper to include it in the probable cause evaluation. Brodnicki further argues that without Callaghan's identification of him at the showup the police lacked probable cause for his arrest. We are not persuaded. Even if we exclude the showup from our probable cause analysis, what remains are police officers who reasonably believed that they were dealing with a credible victim-witness. They acted on a specific, detailed account of events that led them to Brodnicki's car, and to Brodnicki, who fit the nine-year-old's description of her near-abductor fairly well. At the time of Brodnicki's arrest, the police had no reason to suspect that Callaghan may have been fabricating her story. Indeed, Callaghan's mother vouched to the officers for their daughter's truthfulness and good character. Any

objective reasons for skepticism about Callaghan's allegations emerged only after Brodnicki's arrest.[5]

Nonetheless, we find no need to exclude the showup from our probable cause analysis, for we conclude that the showup was conducted in a constitutional manner. See Neil v. Biggers, 409 U.S. 188, 199-200 (1972) (explaining factors to be considered when evaluating likelihood of misidentification because of suggestiveness of confrontation procedures). While one-man showups have been criticized as "inherently suggestive and a practice to be avoided," United States v. Sanders, 547 F.2d 1037, 1040 (8th Cir. 1976), cert. denied, 431 U.S. 956 (1977), evidence of such a showup without more does not violate due process. See Pratt v. Parratt, 615 F.2d 486, 488 (8th Cir.), cert. denied, 449 U.S. 852 (1980). The question is whether the showup was impermissibly suggestive, and if so whether in all of the circumstances of the case the suggestive confrontation created "a very substantial likelihood of irreparable misidentification." See United States v. Henderson, 719 F.2d 934, 936 (8th Cir. 1983) (internal quotations and citation omitted). In assessing reliability, we consider such factors as the opportunity of the witness to view the suspect during the commission of the crime; the witness's degree of attention; the accuracy of the witness's prior description of the suspect; the level of certainty demonstrated by the witness at the confrontation; and the length of time between the crime and the confrontation. Biggers, 409 U.S. at 199-200. Applying these factors to the showup in this case, we find the showup was not impermissibly suggestive. Callaghan had ample opportunity to observe the man she alleged had tried to entice her into his car;

---

[5]For example, at the preliminary hearing Callaghan testified that Brodnicki wore a green, red, and yellow shirt, and had gray hair. This is irrelevant to our probable cause analysis because it happened after the police officers already had arrested Brodnicki based on their determination that they had probable cause to do so.

it was daytime and her view of the driver was not obstructed. She gave the police a detailed description of the man and the car that he allegedly was driving. Her description of the man did not precisely fit Brodnicki, but was not totally off the mark either; the inconsistencies were not so glaring as necessarily to cast doubt on her story. She was certain in her identification of Brodnicki at the showup. The showup took place on the same afternoon as the alleged incident and within an hour of Callaghan's report of the incident to the police. In these circumstances, we conclude that the showup created, at most, only a minimal likelihood of misidentification, and that it therefore was not unreasonable for the police officers to rely on Callaghan's positive identification of Brodnicki in making their probable cause determination.

Because we conclude that the officers had probable cause to arrest Brodnicki, he has no basis for his § 1983 claim against them. See Warren v. City of Lincoln, 864 F.2d 1436, 1441 (8th Cir.), cert. denied, 490 U.S. 1091 (1989). In addition, since the officers did not violate Brodnicki's constitutional rights, it follows that Brodnicki's claim against the City of Omaha under a theory of inadequate training or municipal custom lacks merit. See e.g., Abbott v. City of Crocker, 30 F.3d 994, 998 (8th Cir. 1994) (holding that city cannot be held liable on a failure to train theory unless the police officer is found liable on the underlying substantive claim). Accordingly, the District Court did not err in granting summary judgment for the officers and the City on Brodnicki's § 1983 claims against them. We need not and do not consider the officers' qualified immunity defense, which the District Court did not address, presumably because the record that already had been developed so clearly supported the officers' alternative motion for summary judgment on the merits.

# III.

Brodnicki argues that the District Court improperly granted summary judgment on his § 1983 claim against county attorney Jansen. Claiming that Jansen violated his due process rights in prosecuting him for attempted kidnapping, Brodnicki contends that Jansen's actions during the handling of his criminal case fell outside the protection of absolute immunity normally afforded prosecutors. Brodnicki asserts that he was deprived of due process when Jansen stepped outside of his role as advocate for the state and instead took on administrative functions akin to a police detective. According to Brodnicki, Jansen is not entitled to absolute immunity for: (1) Jansen's request to examine certain polygraph charts; (2) Jansen's oversight of his investigator who interviewed potential alibi witnesses in preparation for a bond revocation hearing; and (3) a meeting held between Jansen and Brodnicki's counsel, at the latter's request, to discuss the case. We hold that the District Court correctly concluded that Jansen is entitled to absolute immunity.

Prosecutors may be entitled to either absolute or qualified immunity from civil liability under 42 U.S.C. § 1983 for actions undertaken pursuant to their official duties. If the prosecutor is acting as advocate for the state in a criminal prosecution, then the prosecutor is entitled to absolute immunity. Buckley v. Fitzsimmons, 113 S. Ct. 2606, 2615 (1993). Absolute immunity covers prosecutorial functions such as the initiation and pursuit of a criminal prosecution, the presentation of the state's case at trial, and other conduct that is intimately associated with the judicial process. Id.; Imbler v. Pachtman, 424 U.S. 409, 430-31 n.33 (1976). In contrast, a prosecutor is entitled only to qualified immunity when he pursues actions in an "investigatory" or "administrative" capacity. Buckley, 113 S. Ct. at 2616. In determining whether particular actions of government officials fit within the absolute or qualified immunity standard, the Supreme

Court has adopted a functional approach that looks to "the nature of the function performed, not the identity of the actor who performed it." Forrester v. White, 484 U.S. 219, 229 (1987) (finding state court judge does not have absolute immunity from damages suit for his administrative decision to demote and dismiss a court employee); see also Buckley, 113 S. Ct. at 2618 (holding prosecutor's comments to the media have no functional tie to the judicial process because they do not involve presentation of state's case in court or initiation of prosecution); Burns v. Reed, 500 U.S. 478, 494 (1991) (finding absolute immunity from liability for damages under § 1983 does not apply to state prosecutor's giving of legal advice to police but does extend to his participating in probable cause hearing); Imbler, 424 U.S. at 431 (holding prosecutor is absolutely immune from activity of initiating prosecution or for actions taken in presenting state's case).

Brodnicki asserts that Jansen's review of the polygraph results was investigative work usually performed by the police, and therefore Jansen is not entitled to absolute immunity. We disagree. While it may be true that some of Jansen's actions on this case are similar to those performed by the police or other administrative agents of the state, our inquiry focuses not on whether the act could be performed by the police as investigators, but rather on whether the act was closely related to Jansen's role as an advocate for the state. See Buckley, 113 S. Ct. at 2615. It is fundamental that "[p]reparation both for the initiation of the criminal process and for trial, may require the obtaining, reviewing, and evaluating of evidence." Imbler, 424 U.S. at 431 n.33. In this case, Brodnicki's counsel brought the results of Brodnicki's polygraph test to Jansen in an effort to persuade him to dismiss the case. As county attorney, Jansen was under a duty to review this information as part of his role as advocate for the state. Jansen reviewed the polygraph results to determine whether the case should proceed or should be dismissed. Jansen is entitled

to absolute immunity for these actions.  To hold otherwise would be to fashion a rule that would allow defense counsel to defeat absolute immunity by initiating a meeting with the prosecutor and asking the prosecutor to review the case with an eye toward dismissal of the charges.  Such a rule has no support in the law and will not be countenanced here.

Brodnicki also asserts that because Jansen had not assigned Brodnicki's case to himself (a deputy county attorney had been placed in charge of the case) and because, according to Brodnicki, Jansen played merely an administrative role in the case, he is entitled only to qualified immunity.  This argument is without merit.  One of Jansen's responsibilities as county attorney includes supervision of all of the deputy county attorneys in both criminal and civil matters.  It is irrelevant that Jansen was not the trial attorney assigned to Brodnicki's case.  As county attorney, Jansen is the person to whom his deputy county attorneys must come for permission to dismiss a case.  At oral argument, Brodnicki's counsel conceded that the primary reason he went to Jansen with the polygraph results was to persuade Jansen to dismiss the charges.  In short, counsel asked Jansen to exercise his professional judgment and Jansen did so, although not with the immediate result counsel wished.  It is precisely the exercise of professional judgment of this sort that is at the core of Jansen's role as advocate for the state.  We thus conclude that Jansen is absolutely immune for the decisions that he made with respect to the disposition of Brodnicki's case.  See Zar v. South Dakota Bd. of Examiners, 976 F.2d 459, 466 (8th Cir. 1992); Williams v. Hartje, 827 F.2d 1203, 1210 (8th Cir. 1987).

Brodnicki maintains that Jansen is not entitled to absolute immunity with respect to the interviews that Jansen's investigator conducted with Brodnicki's potential witnesses.  Here again, Brodnicki's arguments are without merit.  These interviews were conducted during the pendency of a proceeding to revoke Brodnicki's

-11-

release on bond.[6]  Brodnicki concedes that the interviews could be viewed either as preparation for the revocation hearing or as an evaluation of the reliability of the witnesses.  Under either view, Jansen was carrying out his responsibilities as advocate for the state and is entitled to absolute immunity.

Finally, Brodnicki argues that Jansen erred in believing that Brodnicki was guilty of a crime and in deciding to pursue a criminal action against him.  This argument misses the point.  While Brodnicki may believe that Jansen's decision to pursue the case was incorrect, Jansen does not have to defend alleged prosecutorial mistakes if those mistakes occurred in the performance of a function recognized as inherent in his role as advocate for the state.  Myers v. Morris, 810 F.2d 1437, 1446 (8th Cir.), cert. denied, 484 U.S. 828 (1987).  The decisions relating to the initiation and dismissal of cases are at the very heart of a prosecutor's function as an advocate for the state, and absolute immunity thus attaches to those decisions.

Having considered all Brodnicki's arguments, we hold that the District Court was correct in dismissing Brodnicki's claims against Jansen on the ground that Jansen is entitled to absolute immunity from suit on those claims.

---

[6]One of the conditions of Brodnicki's release on bond was that he have no contact with Callaghan.  Callaghan reported that Brodnicki, while released on bond, had attempted to contact her at her home.  A revocation hearing was held before the district court of Douglas County to  determine if in fact Brodnicki had violated this condition of his release on bond.  Because of time problems, the court was unable to hear the testimony of Brodnicki's witnesses, and the hearing was ordered continued, without a date certain being set for its resumption.  During the continuance, the county attorney's office sent an investigator to interview Brodnicki's witnesses.  The bond revocation proceedings were not pursued and the case later was dismissed.

**IV.**

For the foregoing reasons, the judgment of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.